RECEIVED

JAN 2 7 2021

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
               DEPUTY CLERK

FILED

JAN 2 7 2021

CLERK, U.S. DISTRICT CLERK
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

M. PATRICIA CANTU and
ROBERTO CANTU

    Plaintiffs,

v.

AUSTIN POLICE DEPARTMENT
CHIEF OF AUSTIN POLICE
DEPARTMENT, BRIAN MANLEY;
DETECTIVE ERIN TRUHO (SUI);
SERGEANT MICHAEL JOSEPH;
OFFICERS JACOB BEIROWSKI,
ROBERT MATTINGLY,
LUIS ALBERTO CAMACHO III,
KYLE PETERSON, JULIAN PADRO-
MARTIN #8243, CHRISTOPHER J.
KNODEL; THE CITY OF AUSTIN,
TEXAS REY ARELLANO, ASSISTANT
CITY MANAGER; FARAH C.
MUSCADIN, DIRECTOR, OFFICE OF
POLICE OVERSIGHT; TRAVIS
COUNTY MEDICAL EXAMINER'S
OFFICE DR. VICKIE L. WILLOUGHBY,
D. O..DEPUTY MEDICAL EXAMINER

    Defendants.

§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§
§

Cause No. _____

**1:21 CV 0084 LY**

I.

**INTRODUCTION**

1.1    This action seeks damages, punitive damages, attorneys' fees, expert fees, taxable costs

of the court, pre-judgment, and post-judgment interest because of civilly wrongful

conduct in violation of the laws of the United States and related to the death of Paul

Andrew Cantu "Paul Cantu") by Austin Police Department ("APD") Sgt. Michael Joseph

"Sgt. Joseph" and APD Officers Jacob Beirowski "Beirowski", Kyle Peterson "Peterson", Robert Mattingly "Mattingly, and Luis Alberto Camacho, III. "Camacho". Additionally, complaint names Chief of APD Police Brian Manley for obstruction of justice and APD Officers Julian Padro-Martin (#8243) and Christopher J. Knodel for wrongfully "*classifying*" Paul Cantu forcing front desk at Saint David's South Austin to delete all identifiable information of Paul Cantu, including but not limited to driver's license, name, job I.D. card; medical insurance information; clinical history, medical records; blood type; emergency and family contact information; interference with his proper Medical Treatment to ensure his death and to allow harvesting of Paul Cantu's organs including corneas, spleen, liver, and tissue Detective Erin Truho (Special Unit Investigator) for interfering with the Certified Autopsy Records of Paul Cantu. City of Austin is cited for improper training of APD officers and racially profiling Hispanics and people with disabilities. Representatives from City of Austin Rey Arellano, Assistant City Manager and Farah C. Muscadin, Director of Austin Office of Police Oversight for failure to report, investigate, post complains in their websites and discrimination against Hispanics and people with Disabilities. The Travis County Medical Examiner's Office and Dr. Vickie L. Willoughby are included for failure to report two serious incidents of use of Tasers or "non-lethal weapons" in the Certified Autopsy Report which are required to be reported by Federal Laws.

## II.

## THE PARTIES

2.1    Plaintiffs M. Patricia Cantu and Roberto Cantu ("the Cantus") Plaintiffs reside in San Antonio, Texas. Paul Cantu's surviving parents Roberto and M. Patricia Cantu ("The

Cantus") are the parents and sole surviving heirs of Paul Andrew Cantu, decedent. No probate proceedings arose from Paul Cantu's death, and none are necessary. The Cantus as Plaintiffs bring this lawsuit for excessive force and wrongful death against APD Chief of Police Brian Manley, APD "Sgt. Joseph", Detective Erin Truho Special Unit Investigation s and APD Officers Beirowski, Peterson, Mattingly, Camacho, Julian Padro-Martin (APD # 8243) Padro-Martin; and Christopher J. Knodel "Knodel".

2.2   Defendant the City of Austin is an entity which can be served at:

City Manager, *Key Contact: Mr. Spencer Cronk

The City of Austin

City Manager

City Hall 301 W. 2nd , 3rd Floor

Austin, TX 78702

2.3   Defendant Rey Arellano is Assistant City Manager of the City of Austin.

Mr. Ray Arellano can be served at:

City Manager, *Key Contact: Mr. Spencer Cronk

The City of Austin

City Manager

City Hall 301 W. 2nd , 3rd Floor

Austin, TX 78702

2.4   Defendant Farah C. Muscadin is the Director of the City of Austin Office of Police Oversight. Ms. Musadin can be served at:

City Manager, *Key Contact: Mr. Spencer Cronk

The City of Austin, City Manager

City Hall 301 W. 2nd , 3rd Floor

Austin, TX 78702

**OR:**

Farah C. Muscadin,

Director

Office of Police Oversight (OPO)

1520 Rutherford Lane

Austin, TX 78754

**2.5** Defendant the Travis County Medical Examiner Office (TCMEO) is an entity which can be served at:

Travis County Medical Examiner's Office

Chief Administrative Office

7723 Springdale Road

Austin, Texas 78724

**2.6** Defendant Dr. Vickie L. Willougby, D.O, Deputy Medical Examiner is a Forensic Pathologist who works for The Travis County Medical Examiners' Office. Dr. Willoughby can be served at:

Travis County Medical Examiner's Office

Chief Administrative Office

7723 Springdale Road

Austin, Texas 78724

**2.7** Chief of Police Brian Manley is the Chief of the Austin Police Department (APD) in Austin, Texas.

Chief Brain Manley can be served at:

Austin Police Department'

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

2.8    APD Sargent Michael Joseph, APD Officers Jacob Beirowski; Kyle Peterson; Robert

Mattingly; Luis Alberto Camacho III; APD Julian Padro-Martin (#8243) and Christopher

J. Knodle are individuals who can be served at:

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr,

Austin, TX 78748

**OR: ALL APD DETECTIVES SARGENT AND OFFICERS CAN BE SERVED AT;**

Austin Police Department'

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

2.9    Detective Erin Truho is a Special Investigation Unit (SUI). Detective Erin Truho can be

served at:

Austin Police Department'

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**2.10**   Defendant APD Sergeant Michael Joseph is an individual who can be served at:

Austin Police Department

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**OR**

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr,

Austin, TX 78748

**2.11**   Defendant APD Officer Jacob Beirowki is an individual who can be served at:

Austin Police Department

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**OR**

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr,

Austin, TX 78748

**2.12**   Defendant APD Officer Kyle Peterson is an individual who can be served at:

Austin Police Department

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**OR**

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr,

Austin, TX 78748

**2.13**   Defendant APD Officer Robert Mattingly is an individual who can be served at:

Austin Police Department

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**OR**

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr,

Austin, TX 78748

**2.14**   Defendant APD Officer Luis Alberto Camacho III is an individual who can be served at:

Austin Police Department

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**OR**

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr,

Austin, TX 78748

APD Officers Julian Padro-Martin (#8243) (sic) is an individual who can be served at:

Austin Police Department

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**OR**

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr,

Austin, TX 78748

**2.15**    Christopher J. Knodle is an individual who can be served at:

Austin Police Department

Brian Manley Chief of the Austin Police Department (APD)

715 E. 8th Street

Austin, TX 78701

**OR**

Austin Police Department

South East Branch

404 Ralph Ablanedo Dr, Austin, TX 78748

8

## III.
## __COMPLAINT__

**3.1**    At approximately 1:40 a.m. in the early morning of January 29, 2010, Sgt. Michael

Joseph ("Sgt. Joseph") found Paul Cantu in his wrecked car halfway down an

embankment along Onion Creek off of East William Cannon Road.  Paul Cantu had

suffered convulsions or a seizure earlier before the shooting and texted his father stating

his car, which was titled in Paul Cantu's name and with a lien by Ally Bank, contrary to

what was reported on television station KXAN the next morning and by APD police

reports, was destroyed.  Paul Cantu emerged from his car fully clothed and holding a cell

phone and a flashlight. The accident took place at approximately 10:52 p.m. on Monday

night, January 28, 2019.

**3.2**    Sgt. Joseph, pointing his gun at Paul Cantu, screamed at Paul confusing commands, and

ordered him to drop to the ground which he did. Paul put the cell phone and flashlight to

his side, explained to Sgt. Joseph that he did not have a gun, that Sgt. Joseph was the one

with the gun, with Paul kneeling with both hands in the ground begged for his life.

**3.3**    Sgt. Joseph called for officer assistance on his radio while holding Paul Cantu at gun

point. Sgt. Joseph refused to call hostage negotiators and or a mental health unit when he

was asked, requesting instead a shield and a SWAT Team, ordering in advance the

military-style execution of Paul Cantu.

**3.4**    Approximately fifty (50) APD officers arrived at the scene. At approximately 1:46 a.m.

on January 29, 2019 Austin Police Department officer Kyle Peterson, ("Peterson"), with

the permission of Sgt. Joseph, without giving the legally required verbal warning to Paul

Cantu, shot Paul Cantu from behind his back and shot Paul Cantu's lower left back with a

taser or a "non-lethal weapon" for a prolonged time against Paul Andrew Cantu" who

posed no threat and was kneeling with both hands in the floor, caused his hands to move toward the sky, releasing whatever was misperceived or claimed to have in his hands, causing cardiac arrest, stiff jaw, and pulverized joints in both knees. Paul Cantu dropped to the ground. Based on one of several dash cam or body cam videos, Paul Cantu yelled loudly with excruciating pain and turned his torso to his left side and touched his lower back in agony. This was the first use of excessive and deadly force by the APD officers.

3.5   At approximately 1:47 A.M. on January 29, 2019, within seconds after Peterson had fired the projectile on Paul Cantu's lower left back, APD officers Robert Mattingly ("Mattingly") and Luis Alberto Camacho III ("Camacho") shot at Paul Cantu 22 times with approximately 5-7 deadly bullets entering his body (2 shots to the back) killing him. From the previous less-than-lethal projectile, Paul Cantu had fallen to the ground face down. Mattingly shot the first bullet. Mattingly waited for a while. You can clearly see Paul had nothing in both hands. Mattingly shot 3-4 times more. That was intentional and premeditated use of deadly force. Camacho started shooting about 12-15 rounds. After the first shot, the first three to four bullets flipped Paul Cantu's body into the air and his body fell back to the ground with Paul Cantu facing up. Camacho continued shooting even while Paul Cantu lay mortally wounded on the ground. This was premeditated use of unnecessary and unjustifiable deadly force. Just before the time of the taser and shooting, Paul Cantu had nothing in his hands or within reach of where his body lay.

3.6   While Paul lay dying at approximately 1:50:05 APD officer Jacob Beirowski ("Beirowki") approached Paul Cantu, conducted a "body search" looking for a gun and he found none.

**3.7**   Beirowski removed with his shears all of Paul Cantu's clothing leaving him completely naked in about 33-degree weather, bleeding to death in the dirt. Beirowski handcuffed Paul Cantu and proceeded to torture him with tasers in direct contact to his bare skin in his head, neck, face, forehead, testicles, buttocks, abdomen, hands, and arms as established in the photos from the Medical Examiner from Paul Cantu's autopsy.

**3.8**   Paul was physically and sexually assaulted by Beirowski and other APD officers. This was excessive intentional use of force and torture.

**3.9**   All, about 50 APD officers on the site took too long to call for an ambulance or EMS and no one intervened to STOP the brutality and use of deadly force.

**3.10**   The Cantus assert several causes of action against the APD Chief Brian Manley, a detective a sergeant and several officers; The City of Austin ("The City") Rey Arellano; Farah C. Muscadin Office of Police Oversight, the Travis County Medical Examiner's Office, and Dr. Vicky Willoughby ("Dr. Willoughby).

**IV.**

**DISCOVERY**

**4.1**   Plaintiffs intend to conduct discovery in accordance with the Court's scheduling order.

**V.**

**JURISDICTION AND VENUE**

**5.1**   This Court has subject matter jurisdiction over all of Plaintiffs' federal civil rights claims pursuant to 28 U.S.C. §1331. The Court also has jurisdiction over Plaintiffs' claim brought under 42 U.S.C. §1983, pursuant to 28 U.S.C. §1343 and under the Americans with Disabilities Act with respect to the Austin Police Department's Sergeant Michael Joseph and Police Officers Beirowki,, Camacho, and Mattingly failure to accommodate a person

with a disability in the course of the investigation and arrest  for a crime committed by someone else, a white suspect, which caused Paul Andrew Cantu to suffer greater indignity, greater injury and ultimately death.

**5.2.1**   The events giving rise to the claims occurred in Travis County, Texas, in this district. Accordingly, this Court is the proper venue, pursuant to 28 U.S.C. § 1391(b)(2).

## VI

## FACTS

**6.1**   At approximately 10:22 P.M. On January 28, 2019, according to a video of the car chase and the first original Police Report, APD Officer Beirowski performed of a car chase of a suspect over a minor traffic violation: not coming to a full stop during a right turn. A review of that video established that the tires of the vehicle came to a stop so the decision to pursue was based on Beirowski harassing the suspect.

**6.2**   Beirowski did not see the suspect; and could not provide a clear description of the suspect nor the vehicle.  In fact, Beirowski attempted to get that information from Paul Cantu's father in a telephone call to his father, Roberto Cantu that evening claiming that Mr. Roberto Cantu had been driving in Austin weaving in and out of traffic while drunk. When Cantu asked Beirowski the interior of the vehicle that Paul Cantu was purported to have driven, Beriowski's response was it was empty—that there was nothing inside the car. However since Paul Cantu was in the middle of move to permanent housing in Austin, the vehicle Paul Cantu drove that evening had clothing, baskets of clothing and small appliances in his car as he was supposed to have moved into a new dwelling that evening.

**6.3**   APD Officer Ricardo Medrano, "Medrano" who assisted Beirowski stated in his Original

Police report, which had taken place in an HEB parking lot, he reported:

"*As the driver passed me, I noticed that the driver appeared to be a white or light skinned male 40's-50's, wearing a black or dark colored baseball cap and white hairs ticking out from the sides of the baseball cap.*"

**6.4**   Medrano and a Dispatcher discussed this in a conversation which was caught on video. They clearly stated that the suspect who evaded the car chase was a white male in his 40's-50's with lots of white hair and driving a different vehicle.

**6.5**   The suspect did not stop and Beirowski decided not to chase him. But asked Medrano for the description of the suspect. Again, Medrano stated that:

"*the driver appeared to be a white or light skinned male 40's-50's, wearing a black or dark colored baseball cap and white hair sticking out from the sides of the baseball cap*".

**6.6**   At approximately 11:00 P.M. On January 28, 2019. APD Officer Beirowski, called Roberto Cantu ("Roberto Cantu") in his private cell phone. Beirowski first tried to frame Tax Attorney Roberto Cantu (Paul Cantu's father) of evading the car chase under the influence of alcohol or drugs, weaving in and out of traffic on IH-35 South and wanted to incarcerate him that night.

**6.7**   Roberto Cantu (Paul Cantu's father) spoke with Beirowski for about one hour and was unable to convince him that he was not in Austin, Texas when the alleged car chase took place.

**6.8**     Concerned for her husband, Roberto Cantu, M. Patricia Cantu (Paul Cantu's mother) called Austin 911 and 311 and spoke with APD Officer Shelly Holmstrom ("Holmstrom"). We have yet to receive a recording of that 9-1-1 despite our request under the Texas Public Information Act.

**6.9**     M. Patricia Cantu (Paul Cantu's mother), asked Holmstrom if the call received by Roberto Cantu was legitimate and if the person making all those false accusations against Roberto Cantu was an Austin Police Officer.

**6.10**   Holmstrom verified for M. Patricia Cantu that the call was legitimate and that the person making the call was indeed an Austin Police Officer.

**6.11**   Holmstrom verified that Roberto Cantu (Paul Cantu's Father) had lunch with his son in Austin, Texas around noon and returned to San Antonio. Roberto Cantu arrived in San Antonio Texas at 3:30 pm; talked to some neighbors in person and clients over the phone. Hence, it was proven that Roberto Cantu could NOT have been the suspect who evaded the APD Car chase in Austin which according to Beirowski, had occurred in Austin, Texas around 10:30 P.M.

**6.12**   M. Patricia Cantu (Wife of Roberto Cantu and Paul Cantu's mother) reiterated to Holmstrom that her husband had not been in Austin at the time the supposed car chase took place and the car allegedly involved in the Austin Police Chase did not belong to Roberto Cantu NOR to Paul Cantu.

**6.13**   Furthermore, M. Patricia Cantu explained to Holmstrom that her son, Paul Cantu, had recently experienced seizures and volunteered to release his medical records as she had a Power of Attorney from her son. M. Patricia Cantu, informed Holmstrom Badge of the hospitals her son Paul Cantu had been treated.

6.14   Holmstrom called Dell Seton Hospital and verified that Paul Cantu was treated there.
around January 24/19, was tested, and diagnosed with SEIZURES [A
NEUROLOGICAL DISORDER] and released with papers advising him to see a
neurologist. [Paul was killed before being able to see the specialist].

6.15   M. Patricia Cantu then asked if her son Paul Cantu was being charged with any crime
and to read him his rights and be given the opportunity to call an attorney and remain
silenced. She was told: NO. M. Patricia Cantu asked if her son had been taken to a
prison: she was told NO.  Ms. Cantu asked if there was a warrant for Paul Cantu's arrest
or if APD had a warrant to search him and his car; she was told: NO.

6.16   M. Patricia Cantu asked if her son had been taken to a hospital or was being transported
by an ambulance: She was told; No.  M. Patricia Cantu asked Holmstrom where was
her son Paul Cantu? Holmstrom stated; APD did not know.

6.17   Holmstrom instructed M. Patricia Cantu to file a "Request to Locate" from Beirowski.

6.18   The Cantus heard their son's Paul Cantu's voice while he was being interrogated by
Beirowski. When confronted with this fact, Beirowski hung up the phone.

6.19   It was at that time that Roberto Cantu (Paul Cantu's father) noticed two previous texts his
son Paul Cantu had sent him. The first one implied Paul Cantu had suffered a seizure and
was treated or sought medical help at the Austin VA Outpatient clinic earlier. The second
text stated his car was destroyed, but Paul could not give his precise location. He only
mentioned the name of the street, ("Auburn Blaze") which was a residential street in a cul
de sac in Austin, Texas.

6.20   Beirowski called back. M. Patricia Cantu informed both officers that her son Paul

suffered from severe asthma; was disabled and had ¼ the lung capacity; suffered from chronic psoriasis; had Crohn's disease symptoms, and SEIZURES [a newly developed neurological syndrome, possibly caused by the medication for psoriasis COSENTYX; which caused him to stutter; faint; lose consciousness, may not be able to follow commands or carry a normal conversation; could be disoriented] that Paul Cantu had LOST 50 POUNDS, AND ALL HIS HAIR AND WAS GRAVELY ILL, WEAK AND DEBILITATED.

6.21   M. Patricia Cantu reluctantly complied to ask for a "Request to Locate" her son but warned both officers Holmstrom and Beirowski of the delicate health of her son Paul Andrew Cantu and requested he be treated carefully, to call EMS or an ambulance.

6.22   M. Patricia Cantu is disabled and was in a wheelchair in severe pain and immobile while awaiting decision to have double-knee joint replacement surgery when the critical incident happened. It was past midnight the Cantus, parents of Paul Cantu, were in San Antonio, Texas. The Cantus did not know the exact location of their son's Paul Cantu in Austin Texas.

6.23   Beirowski dissuaded Roberto Cantu from driving to Austin to try to find his son, Paul Cantu stating: "what are you going to do past midnight, in the dark, in the middle of winter, look in every alley and every corner?"

6.24   The last words of Beirowski to the Cantus were: "OUR LITTLE CHASE FOR YOUR SON IS OVER".

6.25   Beirowski, had pulled the Cantus' son Paul Cantu over, initiating an illegal traffic stop [or pushed him off the main roadway] at 10:25 PM. [In a press release from APD, Redacted, obtained through a FREEDOM OF INFORMATION REQUEST, Austin

Police Officer Jacob Beirowski Badge Number 7838 STATED THAT on January 28th, 2019, at approximately <u>22: 25 hours</u>, I, Officer Beirowski #7838.... "I followed it [Paul's car] to the intersection of E William Cannon Dr and S IH 35 SVRD NB and activated my emergency lights <u>to initiate the traffic stop</u>".

**6.26** Beirowski lied to the Cantus when he called them at about 11:00 P.M. Beirowski already had followed their son Paul Cantu and pushed him off the road and or already had physically and sexually attacked him, seized his money, then threatened Paul Cantu with incarceration and to incarcerate his father Roberto Cantu also. This was evidenced in a video shown to the Cantus on January 6, 2020 by the Travis County District Attorney's Office Director of Civil Rights.

**6.27** Beirowski knew that it was a different suspect, a white male driving a different vehicle who had evaded the APD car chase earlier. This was caught on video taken by Medrano and it was widely reported by Chief of Police Brian Manley in his media brief after the Officer Involved Shooting (OIS) of Paul Cantu and during interviews with KXAN and other media.

**6.28** Late in the evening of January 28, 2019 at 10:30 p.m. according to a police report, APD Police Officer Jacob Beirowski, attempted to stop Paul Cantu's vehile at the intersection of Slaughter Lane and the IH-35 access road heading north. He reportedly "believed" Paul Cantu was a person suspected of evading an officer earlier in the day, though Paul Cantu was confirmed to be driving a different vehicle than that of the evading vehicle. After the unfolding violence, the vehicle was found off the main roadway near 7900 E. William Cannon Drive, Austin, Texas, down an embankment. A radio call by Police

Office Medrano confirmed that the evading vehicle was that of George Charles Tom, and that Paul Cantu's license plates did not match those of the evading vehicle of Mr. Tom.

**6.29** At approximately 1:40 a.m. in the early morning of January 29, 2010, Sgt. Michael Joseph ("Sgt. Joseph") found Paul Cantu in his wrecked car halfway down an embankment along Onion Creek off of E.William Cannon Rd..

**6.30** Paul Cantu emerged from his car fully clothed and holding a cell phone and a flashlight.

**6.31** Sgt. Joseph, pointing his gun at Paul Cantu, screamed at Paul confusing commands, and ordered him to drop to the ground which he did. Paul put the cell phone and flashlight to his side, explained to Sgt. Joseph that he did not have a gun, that Sgt. Joseph was the one with the gun; kneeling with both hands in the ground begged for his life.

**6.32** After Sergeant Joseph arrived at the scene of Paul Cantu's car, which had been wrecked, Sgt. Joseph called other officers and the SWAT team to the scene. "Sgt. Joseph" refused to call hostage negotiators and or a mental health unit when he was asked; requesting instead a shield and a SWAT Team; ordering in advance the military-style execution of Paul Cantu.

**6.33** Defendant Mattingly arrived at the scene moments before Camacho. He reported seeing Paul Cantu on the ground, on his hands and knees. Mattingly took a ballistic shield with him as "Sgt. Joseph" had instructed him to do so in advance and ordered Mattingly to "shoot him [Paul Cantu] straight at gun point."

**6.34** Mattingly claimed to see Paul Cantu pointing "a gun" at his head [while it was a flashlight, one can clearly see light coming from it.] The gun that APD claimed to have found at the scene **had no light and it was brand new, never used] was found in the theretofore locked trunk of Paul's vehicle**. Many officers urged Paul Cantu to put "the

18

gun" down. However, there was enough lighting as 5 APD SUVs' vehicles illuminated Paul Cantu, and Sgt. Joseph and multiple APD Police officers at the scene pointed their lights at Paul Cantu. Paul Cantu himself had a flashlight which he used to be able to climb out of the ditch his car ended up in the dark. Paul pointed this flashlight to himself. On information and belief, Mattingly stated Paul Cantu put down the firearm at a safe distance and remove his hand from it as he was ordered to do so.

**6.35**   When Defendant Camacho arrived at the scene, Paul Cantu was already down on the ground with both his hands in the dirt. On information and belief, Camacho saw that Paul `Cantu was not holding a firearm at this time. Moreover, Camacho changed his testimony several times producing conflictive reports. Right after his interview, at the scene after Camacho was read the safety questions. Camacho is heard on a video talking to a female who was his support system and telling her: "*All the suspect [Paul Cantu] had in his hands was a flashlight not a gun*".

**6.36**   Shortly thereafter, about 1:45 a.m. on January 29, 2019, Police Officer Kyle Peterson ("Peterson") requested permission from Sergeant Joseph, to use a less-than-lethal weapon, stun gun or a taser, upon Paul Cantu, and in the presence and view of Defendants Camacho and Mattingly.

**6.37**   APD officer Kyle Peterson, ("Peterson") without warning, from the back used a taser or a "non-lethal weapon" for a prolonged time against Paul Andrew Cantu "Paul Cantu" who posed no threat and was kneeling with both hands in the floor, causing cardiac arrest; stiff jaw; and pulverized joints in both knees. This was use of excessive and deadly force.

**6.38**Based upon the video evidence shown in San Antonio, Texas by Travis County DA's Civil Rights Director Dexter Gilford to Plaintiffs "The Cantus" on January 6, 2020 in the Bexar County Justice Center Paul Elizondo Tower Building Conference room, Paul Cantu was

struck with from the back, and without warning with projectile from a less-than-lethal weapon. Paul Cantu turned his upper body to the left, touched with his hand one injury yelled in excruciating pain, and experienced visible strong convulsions. Paul Cantu fell to the ground and anything that may have been perceived to be in Paul Cantu's hands, fell out of Paul Cantu's hands.

6.39 On information and belief, the scene was sufficiently lit by surrounding light sources coming from at least five (5) APD SUV's and APD flashlights and APD guns all pointing their lights at Paul Cantu, furthermore Paul Cantu was holding a flashlight, and pointed his flashlight at himself. There were no obstructions to their vision, for Defendants to see Paul Cantu did not have a gun in his hands before he tried standing, as he was ordered to do. Defendants clearly saw that Paul Cantu did not have a gun in his hands when he began to stand up. On information and belief, they had ample time to see and understand that Paul Cantu was unarmed. Furthermore, Paul told them so repeatedly while kneeling with both hands on the dirt, begging for his life.

6.40 When Paul Cantu tried to stand within seconds after he was tasered, Paul did not realize all joints in both knees had pulverized [according to X-Rays and Medical Records] as a direct cause of Peterson's prolonged use of a taser or "non-lethal".

6.41 First both hands were raised showing there was nothing in both hands. Moreover, Paul lost his balance as both knees failed him. Hence, he moved both hands in a 90-degree angle holding both hands to propel his body to stand up and avoid falling into the inclined ditch and uneven terrain in the dark.

6.42 This was a natural body reaction. It was a learned reaction Paul Cantu had learned while tending for his disabled mother M. Patricia Cantu who was on wheelchair waiting for a double-

knee operation. This was reported by Camacho and other APD Officers at the scene on official Police Records. It was also caught in a video taken by a civilian, Zoe Echeverria, which was shown to the Cantus by the Director of Civil Rights Mr. Dexter Gilford on January 6, 2020. To date, APD has failed to provide copies of the 11 cell phone videos taken by Zoe Echevarria, although these copies were ordered to be confiscated by Chief Manley.

**6.43**    Sgt. Joseph instructed Robert Mattingly to shoot Paul Cantu before Paul even stood up, even though he had already granted Office Peterson to use the less-than-lethal weapon.

**6.44**    Defendants Camacho and Mattingly shot about 21 rounds at Paul Cantu; there was one shot then a pause [YOU COULD CLEARLY SHOW PAUL HAD NOTHING IN BOTH HANDS] by Mattingly [a veteran who twice served in Afghanistan] followed by 4-5 deadly shots. Then Camacho shot approximately 12-15 shots--three shots to Paul Cantu's back, two shots to his fingers, one to his pelvis/abdomen. The Medical Examiner and attending physician at the hospital called two of the shots in the back as the flanks of Paul Cantu, but the photo from the funeral home shows the shots were in Paul Cantu's back.

**6.45**    The type of guns used by Mattingly and Camacho were military-style weapons NOT EVEN USED IN COUNTRIES AT WAR! The impact of the military style guns was so strong that caused Paul Cantu's body to flip up into the air from the ground then fell back harshly.

**6.46**    Defendants Camacho and Mattingly continued to shoot Paul Cantu even as he laid dying in the dirt, subsequently killing him.

**6.47**    While Paul lay dying at approximately 1:50:05 APD officer Jacob Beirowski ("Beirowski") approached Paul Cantu, conducted a "body search" looking for a gun and he found none.

21

**6.48**   With his shears, Beirowski removed all of Paul Cantu's clothing leaving him completely

naked in temperatures of the 30s weather with Paul Cantu bleeding to death in the dirt.

**6.49**   Beirowski handcuffed Paul Cantu, who was naked, mortally wounded and bleeding after

being shot [22 times with eight deadly bullets entering his body].

**6. 50**   Paul Cantu laid naked; bleeding to death **but still alive** when **Beirowski,**

Camacho and other Officers decided to inflict Paul Cantu extreme torture with tasers in

direct contact to his bare skin. Paul Cantu was tasered in his head, neck, face, forehead,

testicles, buttocks, abdomen; hands, and arms. This is evidenced by numerous Certified

Forensic Photographs. This was excessive intentional use of force and torture. Camacho  is

heard in one video asking Beirowski: *"Are we going to taser him with all we got?"*

**6.51** Paul Cantu was physically and sexually assaulted by Beirowsky and other APD officers.   The

physical assault and battery were documented in the Certified Autopsy Reports and In Certified

Autopsy Photographs: you can see numerous bruises all over Paul Cantu's body. Furthermore, the X-

Rays and medical records revealed broken bones in his arm.  The torture with tasers was evidenced

in numerous Isolated, labeled and numbered, Certified Forensic Photographs. This was excessive

intentional use of force and torture.

**6.52** In several videos, one can clearly see APD officers opened and searched Paul Cantu's car

without a warrant. One APD officer yelled: *"I found a gun in the trunk"*, but did not show it.

**6.53** In ALL the videos, multiple APD officers can be seen diligently looking for a gun on the ground

and they found none in an area the size of a football fields for about 8 to 10 hours according

to tv and newscaster reports.

**6.54** The APD Officers D took too long to call EMS. The first deadly injury [Taser which caused

**cardiac arrest and stiff jaw impeding him to breath**] and pulverized joints in both knees

occurred at 1:45 AM; the 22-gun shots with 5-8 penetrating bullets with no obvious exit

22

wounds at 1:47 A.M.  **The hospital was only 5 minutes away from where Paul was shot and rescued by EMS. Paul arrived at Saint David's South Austin Medical Center at approximately 2:13 A.M.  OFFICIAL MEDICAL RECORDS PAUL ARRIVED APPROXIMATEDLY 28-30 MINUTES AFTER THE OFFICER INVOLVED SHOOTING (OIS). APD LEFT PAUL BLEEDING TO DEATH, NAKED AND MORTALLY WOUNDED IN THE DIRT FOR AN ESTIMATED 25 MINUTES. PAUL CANTU LOST AN ESTIMATED 5 LITERS OF BLOOD ACCORDING TO OFFICIAL MEDICAL RECORDS.**

**6.55**     Several minutes after Paul Cantu was transported by EMS to Saint David's South Austin Medical Center Beirowski is heard on a video telling the officer who claimed he had found a gun in the trunk of Paul's car: "*Let's stage the scene.*"

**6.56** It is the Cantu's firm belief that APD planted that gun in the scene **after** Paul Cantu was transported by EMS to Saint David's South Austin Medical Center.  Moreover, the gun was never used by Paul Cantu.  It was brand new.  Paul Cantu **tested negative for gun power.  There were no fingerprints nor DNA of Paul Cantu in that gun.  APD admitted only APD officers handled and tested that gun in the scene and there were scene pictures to prove it.**  The gun purported to be used by Paul Cantu was found with foliage above it as if the gun had been thrown in a sideways movement.  The pattern of how the gun was found goes against the pattern of what may have been perceived as dropped vertically.  It is an impossibility for grass and other foliage to grow over a gun that supposedly has been dropped from hands in the air.

**6.57** Officers Mattingly and Camacho both tested positive for gun powder.

**6.58** APD Officers Julia Padro-Martin (#8243) (sic) "Padro-Martin" and Christopher J. Knodel went to

Saint David's' South Austin Medical Center. Upon arrival all relevant identifiable information of Paul Cantu was provided to front desk staff at the Emergency Room. APD Officers had Paul Cantu's wallet in their hands and EMS staff gave a statement. Both officers wrongfully "*classified*" Paul Cantu and checking him in as a "John Doe" forcing front desk at Saint David's South Austin to delete all identifiable information of Paul Cantu, including but not limited to Paul Cantu's driver's license, name, job I.D. card; medical insurance card information; clinical history, medical records; blood type; emergency and family contact information to ensure his death. Paul was then listed as a "*homeless*"; "*Unemployed*". "*UNINSURED or not having Medical Insurance; NO FAMILY; NO EMERGENCY CONTACTS. NO BLOOD TYPE OR ALLERGIES [WHICH WERE LISTED IN HIS EMERGENCY MEDICAL CARD]. HIS MEDICAL HISTORY WAS DELETED SO WERE HIS KNOWN MEDICAL RECORDS. THIS WAS AN INTENTIONAL AND DELIBERATE* ACTION TO IMPEDE PROPER MEDICAL TREATMENT AND CAUSE HIS DEATH.

**6.59** "Padro-Martin" and Christopher J. Knodel interfered with the Critical Emergency Medical treatment of Paul Cantu, violated HIPPA rules; and his right to have an attempt to save his life. Paul had a private health insurance card which allowed him to receive emergency medical treatment, surgery, specialists, and any use of equipment needed to save his life. The APD officers had in their hands Paul Cantu's wallet containing his medical Insurance Card; and his emergency card with his blood type and allergies. APD had been sent in advance Paul Cantu's medical records and APD officers found Paul Cantu's discharged Papers from Dell Seton after he was diagnosed with seizures six days before . The Staff at front Desk reported all information upon arrival at the Emergency Room at Saint David's

South Austin Medical Center.

6.60 "Padro -Martin and Christopher J. Knodel **FORCED the front staff at the ER to delete all his medical records health Insurance and identifiable information.** After Paul was then listed as a homeless, unemployed; with no health insurance and NO family. Paul was given the wrong plasma products during an emergency blood transfusion because There was no time to test his blood, while his blood type and allergies were listed in his emergency card which APD officers had in their hands yet forced the Staff at ER to delete.

6.61 Additionally, the APD officers forced ER front desk to list Paul Cantu as HAVING NO MEDICAL INSURANCE while APD Officers had it in their hands! Paul was made to wait until approximately 3:00 AM to have his emergency surgery. The ER doctor after being told Paul Cantu was a "homeless" , "unemployed" with no health insurance stopped trying to safe his life after about 20 minutes.

6.62 The ER **doctor (Dr. Strong) then asked APD if she could harvest Paul Cantu's Internal Organs for donor recipients.** "Padro-Martin" and Christopher J. Knodel **APPROVED AND GAVE PERMISSION TO THE ER DOCTOR TO HARVEST PAUL CANTU'S INTERNAL ORGANS, EYES FOR CORNEAS AND TISSUES.**

6.63 **"Padro-Martin" and Christopher J. Knodle appropriated Paul Cantu's body WITHOUT CONSENT trying to interfere with the autopsy and concealed the excessive and deadly force Paul Cantu suffered at the hands of APD OFFICERS. THEY GAVE PERMISSION TO THE ER DOCTOR TO HARVEST PAUL CANTU'S INTERNAL ORGANS, EYES AND TISSUES.**

6.64 **THIS WAS DONE WITHOUT CONSENT. PAUL WAS NOT AN ORGAN**

DONOR. APD OFFICERS "PADRO-MARTIN AND "KNODEL" KNEW THIS
BECAUSE THEY HAD IN THEIR HANDS PAUL CANTU'S WALLET WITH
HIS DRIVERS LICENCE, WHICH NUMBER WAS INITIALLY RECORDED
WHEN PAUL CANTU WAS ADMITTED TO THE ER. PAUL CANTU ARRIVED
AT THE ER UNCOUNCIUOS HE NEVER REGAINED COUNCIOUSNESS.
PAUL CANTU DID NOT SIGN ANY FORMS AT SAINT DAVIDS' SOUTH
AUSTIN MEDICAL CENTER.

6.65   BY ORDERS OF APD OFFICERS "PADRO-MARTIN "AND KNODEL" HIS
PARENTS "THE CANTUS" WERE NEVER CONTACTED NOR INFORMED
OF HIS CRITICAL CONDITION AND DEATH WHILE AT SAINT DAVIDS'
SOUTH AUTIN MEDICAL CENTER. HENCE, "THE CANTUS" PAUL
CANTU'S PARENTS AND NEXT OF KIN DID NOT GIVE PERMISSION FOR
ORGAN HARVESTING EITHER.

6.66 "Padro-Martin" (sic) and "Knodel" gave specific orders to Social Services NOT TO
CONTACT HIS FAMILY; or to provide any counseling or social services. In an
egregious act of cruelty "Padro-Martin" and "Knodel" DID NOT AUTHORIZE THE
CHAPLAIN TO PROVIDE LAST RITE PRAYERS TO THE DYING PAUL CANTU
AND VOLUNTEERS WERE DENIED OF PROVIDING PRAYERS AND
COMFORT TO THE DYING PATIENT PAUL CANTU. HIS PARENTS
"THE CANTUS" WERE NEVER CONTACTED.

6.67   Paul Cantu DIED ALONE AFTER SUFFERING HORRENDOUS, VIOLENT

**AND INTENTIONAL INFLICTION OF EMOTIONAL, PHYSICAL, SEXUAL**

**PAIN AND SUFFERENG AND TORTURE by APD OFFICERS.**

6.68   According to a Fax sent by EMS to Saint David's' South Austin Medical Center, which is

now part of Paul Cantu's Permanent Medical Records "Beirowski" told the EMS first

Responders that: "Paul Cantu was running naked after a body search and that the APD

Officer's gun had been accidentally discharged". "Beirowski" listed five (5) gun shot

wounds and gave EMS first responders Paul Cantu's Medical History.

6.69   EMS first responders noted that Paul Cantu was naked and suspected sexual assault. Paul

Was bleeding profusely from his buttocks and the Medical Records at Saint David's'

South Austin Medical Center documented an injury in his buttocks which was

photographed during the autopsy. Paul Cantu did not suffer from hemorrhoids.

6.70   Per EMS first responders Paul Cantu was found 100 yards from the main roadway, naked

wearing only socks in a supine position. **There were no pedestrians** in what EMS first

responders described as a "grassy ditch" in a remote isolated location, and the critical

incident happened very early in the morning, in the coldest night of the winter.

6.71   **Paul Cantu a weak and debilitated disabled patient weighting only 130 pounds**

**Posed no threats to heavily armed Police Officers as there were about fifty (50) APD**

**Officers at the site. Paul Cantu posed no threat to civilians as there were no**

**pedestrians at the sight. Paul Cantu posed no threat to himself; was NOT a**

**psychiatric patient and had NO CRIMINAL RECORDS, NO HISTORY OF**

**VIOLENCE. NO HISTORY OF ATTEMPTED SUICIDE.**

6.72   Mr. Dexter Gilford, "Director of Civil Rights" from the Travis County District

Attorney's office denied that Paul Cantu was found naked and that he was tasered.

27

There are videos and scene photographs which prove it. Mr. Dexter Gilford, "Director of Civil Rights Unit" from the Travis County District Attorney's Office suborned perjury from the EMS first responders' witnesses. **Before** Mr. Dexter Gilford investigated, we had their Report in writing. **After**, Mr. Dexter Gilford investigated the EMS first responders Stated that: "They do not remember what happened". They appeared to suffer from "collective amnesia". Nevertheless, their report was contemporaneous.

6.73    **By orders of Chief of Police Brian Manley the eleven (11) videos taken by a civilian "Zoe Echeverria" were appropriated by APD officers sent to her house. Ms. Echevarria lived close to where the OIS took place. She ran and took the videos capturing the entire Officer Involved Shooting of Paul Cantu.** Zoe Echeverria's cell phone was also confiscated by APD as well.

Mr. Dexter Gilford "Director of Civil Rights Unit" from the Travis County District Attorney's office showed "the Cantus" one video which proved Paul was unarmed during a meeting in San Antonio Texas on January 6, 2020.

To this date by orders of APD Chief Brian Manley, against his own Policies the **Raw videos** taken by Zoe Echeverria have not been released to the Cantus; nor the 911 and 311 calls the Cantus made and other important Police Records, despite numerous requests. This is obstruction of justice to impede The Cantus from filing a Lawsuit against APD. APD Chief Brian Manley is not transparent and tried to "cover-up" the wrongful death of Paul Cantu. APD Chief Brian Manley has been under investigation for Racially Profiling and discrimination and has been asked to resign by many members of City of Austin Counsel.

# VII

## CAUSES OF ACTION

### Claims Against the Austin Police Department

### Excessive Force in Violation of the Fourteenth Amendment to the U.S. Constitution

7.1  Plaintiffs incorporate the foregoing paragraphs as set forth above.

7.2  Acting under the color of state law Beirowski racially profiled Paul Cantu and chased him over a minor traffic violation [not coming to a full stop during a left turn] committed by a different white suspect driving a different car.

7.3  Acting under the color of state law Beirowski racially profiled Paul Cantu's father Roberto Cantu and falsely accused him of a crime he did not commit [evading an APD car chase under the influence of alcohol or drugs] and tried to incarcerate him. Knowing well it was a white male, driving a different car who was involved in the car chase.

7.4  Acting under the color of state law Sgt. Joseph racially profiled Paul Cantu and gave permission to Beirowski to chase him when Beirowski learned from Roberto Cantu that Paul Cantu was carrying $2,000-$,4000 cash to pay for the lease and deposit of a rental property. [Paul had lived permanently in Austin, Texas for only two weeks, was in intensive job training and had been in an out of hospitals. Hence Paul did not time to transfer his bank accounts.]

7.5  Acting under the color of state law Sgt. Joseph racially profiled Paul Cantu and gave permission to Beirowski to chase him when both learned that Paul Cantu was Hispanic disabled in his lung suffered from chronic psoriasis and was experiencing seizures, Chron's Disease, had lost 50 pounds, all his hair and was very ill and debilitated as a reaction to the medicine Cosentyx he was taking for psoriasis [an anaphylactic or allergic reaction.

7.6  Acting under the color of state law Sgt. Joseph pointed a gun at Paul Cantu when he found him in his

car and yelled at him to go to ground. Sgt. Joseph refused to believe Paul Cantu when he told Joseph that it was Joseph the one with a gun and that Paul was not going to hurt Joseph. Sgt. Joseph refused to render medical help to Paul Cantu even after Paul Cantu told him repeatedly; "I can't breathe".

7.7 At the time Sgt. Joseph gave APD Officer Peterson permission to use taser from the back and without warning at Paul Cantu, the now deceased Paul Cantu did not pose a threat to either Peterson, Sgt. Joseph, or Officers Camacho or Mattingly, or anybody else. Paul Cantu was on his knees digging in the dirt trying to hide his only proof: a cell phone or tablet he used to record his violent encounter with APD officers and text for help.

7.8 Peterson shot Paul Cantu in his lower left back with a projectile from a less-than-lethal weapon when Paul Cantu had nothing in his hands, he was begging for his life, in a fetal position with both hands on the ground.

7.9 Acting under color of state law, Defendants Camacho and Mattingly shot and killed 27-year-old Paul Cantu by the side of the road.

7.10    Defendants saw that Paul Cantu was not holding a weapon at the time they shot him, so they knew he did not pose an immediate risk to them or others, making their use of deadly force excessive, and violating Paul Cantu's constitutional right to be free from excessive force during an investigatory stop or arrest.

7.11    Defendants are not entitled to qualified immunity for wrongfully killing Paul Cantu because his right to be free from excessive force during an investigatory stop and or search was clearly established at the time, they killed him.

7.12    It was unreasonable for Defendants, who wore ballistic shields, and or were heavily armed with military style guns and other weapons at the scene of the shooting could believe that their respective lives were in danger and that they feared for their lives, within the meaning required by the Section 1983 statute for them to avail themselves of the claim of qualified immunity.

7.13    According to APD Official Reports and media releases there were an average of **fifty (50)** heavily armed APD officers at the scene. All had received intensive training on how to shoot and use all their weapons. It was unreasonable for Defendants Beirowski, Peterson, Sgt Joseph, Mattingly, and Camacho to believe that their respective lives were in danger and that they feared for their lives, within the meaning required by the Section 1983 statute for them to avail themselves of the claim of qualified immunity. When Paul Cantu [**one individual confronted by heavily armed 50 individuals**] was a disabled, fragile, vulnerable debilitated severely ill patient. And his Medical History and Medical Emergency had been broadcast by radio widely by dispatchers.

7.14    At the time of his violent and deadly encounter with APD Officers, during a Medical Emergency Paul Cantu was a severely asthmatic, disabled in his lung patient. Paul Cantu weighted only 130 pounds [like a cancer patient, Paul was immune suppressed taking strong anti-metabolites]. Paul was suffering from dehydration.

7.15    Paul Cantu had lost fifty (50) pounds and all his hair, was experiencing Irritable Bowel Syndrome or Chron's Disease, and Seizures [a neurological disorder which caused him to shake mildly, faint, loose conscience, experienced disorientation, unable to follow commands, or effectively communicate] as an adverse allergic or anaphylactic reaction to the medicine Cosentyx he had been prescribed for psoriasis.

7.16    Paul Cantu **one (1)** highly debilitated, skinny, ill disabled man could have been easily subdued without use of any non-lethal and lethal weapons by any of the heavily armed, physically fit **fifty (50) Police Officers** present on the scene. Therefore, it was unreasonable for Defendants Beirowski, Peterson, Sgt Joseph, Mattingly, and Camacho to believe that their respective lives were in danger and that they feared for their lives, within the meaning required by the Section 1983 statute for them to avail themselves of the claim of qualified immunity.

7.17    Furthermore, ALL Austin Police Department (APD) defendants Sergeant Michael Joseph and Police Officers Beirowki, Peterson Camacho, and Mattingly refused to hear and believe Paul Cantu's pleads for his life when he repeatedly yelled: "I can't breathe".

31

7.18    The APD officers searched Paul Cantu's car taking his cash, electronics, and documents, but left Paul Cantu's Dell Seton Hospital discharged Medical records in the front seat. Paul Cantu's asthma inhaler and medicines were in his front seat in CVS pharmacy bag. Rather than use this information to render medical aid to the patient APD officers labeled it" "Drug Paraphernalia" to discredit and criminalize the victim.

7.19    It was premeditated homicide, as APD Beirowski and Sgt. Joseph gave orders and planned the military-style execution of Paul Cantu in advance, **before** Paul stood up, while he was on his knees pleading for his life with both hands on the dirt.

7.20    It was premeditated homicide, as APD Beirowski and Holmstrom received Paul Cantu's medical records and were briefed by M. Patricia Cantu of Paul Cantu's Clinical History, and his Medical Emergency in advance of the OIS when filed a "request to locate" and Sgt. Joseph as Beirowski supervisor overhead the conversation.

7.21    Hence, it was unreasonable for Defendants Beirowski, and Sgt Joseph, to believe that their respective lives were in danger and that they feared for their lives, within the meaning required by the Section 1983 statute for them to avail themselves of the claim of qualified immunity.

7.22    Paul Cantu was not warned beforehand by Police Officer Peterson that he was going to be hurt. Paul reacted to the less-than-lethal weapon projectile hitting his lower back by yelling very loud in pain, experienced heavy convulsions all over his body turning his torso, touching his back with an anguished look on his face before falling to the ground, and continued to not have any item or weapon in his hand.

7.23    Defendants failed to render aid to Paul Cantu, knowing well that Paul Cantu was severely asthmatic; disabled in his lung because M. Patricia Cantu his mother called to Austin 911 and 311 and released Paul Cantu's Clinical History and Medical records in advance to Beirowski and Holmstrom and this was announced by the dispatcher over the radio. Furthermore, Paul Cantu himself told Sgt. Joseph and the other officers: "I can't breathe" several times and

shivered in the coldest night of the winter.

7.24   Paul Cantu had a seizure [neurological syndrome] suffered injuries and his vehicle was totaled and undriveable.  Mrs. Cantu's call to Austin 9-1-1 and Austin 3-11 two APD officers Holmstrong and Beirowski promised to carry out a welfare check on Paul Cantu and send Ambulance or EMS.

7.25   Upon their arrival at the crash site on the embankment, Defendants failed to render aid to Paul Cantu, as they knew that Paul suffered from asthma, had recently suffered a seizure, and was stranded with his car in a ditch totaled less than three hours before. This was based on the information previously provided by Plaintiff M. Patricia Cantu to Austin PD 911 and Austin 311 M. Patricia Cantu having sent that medical information to Austin PD, which they had in their hands and should have provided to anyone related to this case or matter.  This information was widely reported and broadcasted through radio by dispatchers several times.

## VIII

## FAILURE TO ACCOMMODATE FOR THE DISABILITY OF PAUL ANDREW CANTU IN THE MIDDLE OF THE INVESTIGATION AND ATTEMPTED ARREST ON JANUARY 29, 2019

8.1   Mrs. Cantu, during her telephone call to APD 9-1-1 informed the APD call assistor that Paul Cantu was asthmatic, had suffered from convulsions recently, had a deflated lung, suffered from Crohn's disease, and had a neurological disorder for which he needed to see a neurologist.

8.2   Mrs. Cantu sent copies of Paul Cantu's medical records to establish that he had these medical conditions that rose to the level of a medical disability. Even the EMT's in the ambulance had copies of Paul Cantu's reports, which presumably had been forwarded by

APD as the Cantus had no way of knowing the fax number of the ambulance dispatched to pick up Paul Cantu in his grave condition.

8.3 The Austin Police Department and its officers had constructive notice of Paul Cantu's medical disability and that knowledge should be imputed to the officers that had found Paul Cantu at the scene of the accident or forwarded the medical disability information on Paul Cantu and the officers on duty, including Sgt. Michael Joseph, Officers Beirowski, Peterson, Camacho and Mattingly ignored what had been sent by either 9-1-1 or dispatch and did not offer any accommodation for Paul's medical disability.

8.4 The lack of the officers' regard for Paul Cantu's medical disability rose to the level of failure to accommodate and a direct violation of Title II of the Americans with Disabilities Act.

8.5 The Police Officers at the scene and specifically Bierowski or Sgt. Joseph had actual knowledge of Paul Cantu's medical disability.

8.6 Also, apparently the officers at the scene of Paul Cantu's shooting spoke to their Austin Police Union President Ken Casady as Mr. Casaday remarked in the  KXAN video which appeared in a YouTube stated "(w)e don't know what kind of mental problems this man was having." With the statement of mental problems, the officers at the site of the shooting, Bierowski, Sg.t Joseph and Captain Manley made no provision and apparently had no procedures to use in a crisis invention in an attempted arrest to account for accommodation with someone with a possible mental health condition which may have arisen when one is driving, has a car  accident and the car is totaled, the temperature is in the thirty degree range, one has had convulsions and/or a seizure and an officer arrives yelling ,when the falsely accused cannot understand directions because of the loud yelling when the wind was blowing that evening and APD decides to shoot and kill because the officers claim to fear for their life  and there are over 50 officers present.

8.7 The Police Officers cannot claim that they had no direct knowledge and had constructive knowledge of Paul Cantu's medical disability.

**8.8**

**Claims Against the City of Austin**

8.8 Plaintiffs assert a *Monell* claim that the City promulgated policies or practices that violated Paul Cantu's Fourth and Fourteenth Amendment rights, including, among others, inadequate training, racial profiling and discriminating against minority suspects such as Hispanics and people with disabilities like Paul Cantu by using unwarranted excessive force and deadly force at disproportionally higher rates. The Cantus (Plaintiffs) assert both a due process claim, and an equal protection claim. Bellow some samples [There are too numerous to cite here they will be compiled in an appendix] of numerous articles of the City of Austin being cited for inadequate training; racial profiling; discrimination against minorities and other policies or practices that violate the Fourth and Fourteenth Amendment rights:

*"The Defendants' APD Sergeant and Officers' training is consistent with such a fundamental misunderstanding of the law and generally accepted police practices regarding the use of deadly force, it would support a conclusion that the training provided by the Austin Police Department to its officer is dangerous and unreasonable."* Jeffrey J. Noble. Expert Witness in Cases of Police Brutality and use of deadly force by APD officers.

Austin Police Officers are weaponized and militarized waging war against innocent civilians. Young Trainees and cadets of the Austin Police Academy have gone public to the denounce the culture of this organization which promotes violence, bigotry, racism, and hatred against minorities:

**AUSTIN POLICE CADETS COMPLAINT ABOUT THE ACADEMY OF POLICE**

https://www.youtube.com/watch?v=xAh3TpZsZWM

**Austin police cadets injured in academy training**
https://www.youtube.com/watch?v=xAh3TpZsZWM

**Hear from cadets who allege abuse in Austin police training academy**

https://www.youtube.com/watch?v=Ssz0Oy006Gc

**APD Chief calls for changes to cadet training**
https://www.youtube.com/watch?v=oeT16wRuOU4

https://www.youtube.com/watch?v=6VFxxqJ6akQ

**Secret tape: Austin police chief angry over minority policing**

**APD violence against civilians during traffic stops: (The Austin Chronicle)**

**APD violence against civilians during traffic stops: (The Austin Chronicle)**

*Original post, Wednesday, April 10, 3:30 pm 2019:*
*When it comes to traffic stops, the Austin Police Department isn't looking so great right about now. Last week, The Atlantic, using numbers from Scott Henson's Grits for Breakfast blog, reported that APD officers are "more likely to use injury-causing force against drivers they pull over than any other large Texas jurisdiction."*
*From the 2018 data Henson compiled courtesy of the state's 2017 Sandra Bland act, 77 times out of every 10,000 APD traffic stops resulted in use of "injury-causing" force. Notably, of the 64 police departments and sheriff offices tracked, Austin had the third highest use of force rate, following Marshall PD (124) and Eagle Pass PD (105). Looking at only at other large jurisdictions, APD topped Houston's police department, which followed with 53 out of 10,000, then Denton PD with 42, and Corpus Christi at 24. (It should be noted that Fort Worth Police Department still has not reported its 2018 data and Dallas PD used force less than 1 time out of 10 k stops.) Additionally, Travis County Sheriff's Office only used force 7.82 stops out of 10 k.*
*Of the many components implemented by the Sandra Bland Act – named after the 28-year-old woman who died in police custody following a traffic stop and aggressive arrest in 2015 – requires police departments throughout the state to collect data on the use of force, Class C misdemeanor arrest rates, and arrests made for unpaid traffic tickets. (Henson noted in his March 9 blog that while the reports are identified as racial profiling reports because they're intended to document racial discrimination, they're also the "most detailed description we have of police activities at Texas traffic stops.") However, the cringe-worthy statistics identified by Henson were omitted from APD's racial profiling report submitted to Mayor Steve Adler and City Council via city memo on Feb. 27. Instead, the department focused only on racial profiling*

*aspect, which showed that Hispanic drivers represented the majority of people searched (44%) after being pulled over, even though white drivers were pulled over at a higher rate (47%). Black drivers accounted for 14.5% of traffic stops but were searched 24.5% of the time.*

*APD's full report to the Texas Commission of Law Enforcement (which can be found* here*), tracks 119,320 traffic stops from 2018. Of those stops, "physical force resulting in bodily injury" was used a total of 921 times. The severity of injury remains undocumented. Additionally, 12,447 stops lead to a search, but contraband was only discovered in 3,662 of those searches – roughly a fourth of the time. Using these numbers, Henson also identified that in 2018 APD made 124 arrests out of every 10,000 stops for Class C Misdemeanors, which should be punishable with a fine and no jail time. Waco PD (with 451 arrests) topped the list, followed by League City (406), San Antonio (246), and Odessa (236).*

*Also tracked in Henson's spreadsheet, which analyzed data from 4.6 million traffic stops from 38 of the state's largest policing jurisdictions, is the number of arrests made for outstanding warrants for traffic tickets per 10,000 stops. Again, APD ranks in the top with 262 arrests per 10 k stops. Houston and El Paso arrested 104 folks out of 10 k on outstanding traffic tickets, while Beaumont PD made 336 arrests for every 10,000 stops and Longview PD topped the list with 473. Henson concluded that "Austin PD stands out among the worst in each category … The city has a reputation as liberal, but these data evidence quite authoritarian policing practices compared to other large Texas jurisdictions."*

**Suit filed against Bastrop police officer alleges financial abuse of elderly woman**
By Brandon Mulder
@brand4on

Posted Jun 27, 2019 at 10:41 AM Updated Jun 27, 2019 at 10:41 AM
https://www.statesman.com/news/20190627/suit-filed-against-bastrop-police-officer-alleges-financial-abuse-of-elderly-woman

8.9  Plaintiffs rely on and seek to unseal several exhibits which will be submitted to the court before the trial for consideration including but not limited to TCOLE Training Records for all Defendants; TCOLE Training Curricula; Internal Affairs History of all Defendants; Auditor's Per Capita Rate of Fatal Shootings; Auditor's Per Capita Rate of MH Fatal Shootings; Washington Post Per Capita Rate of Fatal Shootings. Robert Mattingly's discharge papers from the military. The newspaper articles may be admitted showing that the City of Austin had notice of complaints of discriminatory policing and excessive use of force.

8.10

**Claims Against the Travis County Medical Examiner Dr. Willoughby**

8.10    The Cantus name the Travis County Medical Examiner's Office and Dr. Nancy

Willougby "Dr. Willoughby" who performed the autopsy of their son Paul Cantu. Dr.

Willoughby denied the rights of the Cantus as parents and next of kin to have an

independent Forensic Pathologist Present and or a Forensic Pathologist present in the

autopsy of their deceased Paul Cantu. However, Dr. Willoughby allowed a close

colleague of the APD Officers to sit, observe the entire autopsy and dictate what could

and could not be stated in the Certified Autopsy Report of Paul Cantu. The first excessive

tasing of Paul Cantu, from the back without warning, was caught on video; APD officer

Camacho stated it in his Official Interview and it was mentioned Kyle Peterson's Police

Report. According to EMS and the permanent medical records from Saint David's' South

Medical Center, this first tasering caused Cardiac arrest; stiff jaw [which impeded Paul to

breath and be given an Oxygen Mask and or apply CPR] both deadly due to Paul Cantu's

asthma and disability in his lung; it also pulverized Paul's joints in both knees [evidenced

by X-Rays] which caused Paul to lose his balance and Paul raised both hands when

ordered to stand up making it look as "*though he had a weapon*" in his hands according

to Chief of Police Brian Manley.  This first prolonged tasering caused Paul to experience

strong convulsions. Both the lack of oxygen and the convulsions caused by this first taser

may have contributed to Paul's disorientation, and inability to follow commands, because

Paul had been recently diagnosed with a neurological disorder which caused mild

seizures in which he fainted and lost consciousness. The Certified Forensic Photographs,

which were identified; isolated and labeled clearly revealed taser prong injuries in Paul's

forehead; electric shock burns consistent with a taser or stun gun applied directly to bare

skin in his head, arms, hands and legs, testicles; buttocks and are too numerous to have

been ignored and taser "dots" markings were noticed all over his body. Yet Dr. Willoughby chose NOT TO REPORT both incidents of tasering by prolonged time in tasering and to torture Paul AFTER he had been shot; stripped of all his cloths; handcuffed and bleeding to death completely naked in the dirt. This according to the FBI is a "Federal felony offense". Because by federal Laws both the APD and the Travis County Medical Examiner who performed the autopsy must report the use of tasers or stunt guns and the injuries caused by these *"non-lethal weapons"*, which have been scientifically proven to cause severe pain, permanent serious injuries, and death. Dr. Willoughby took possession of Paul Cantu's Body; the TCME Office twice threaten to cremate his body; delaying his Christian Burial for several days and Transportation to his hometown in San Antonio Texas. Dr. Willoughby sent the wrong file of a decedent to the funeral home and attempted to send the wrong body! The Cantus were then informed that the internal organs; eyes for corneas and tissues of their son Paul Cantu had been harvested and given up for prospective transplant recipients; this was done illegally, without consent. Paul Cantu was not an organ donor; he arrived unconscious at the Saint David's South Austin Medical Center did not sign any forms and never regained consciousness. The Cantus were never contacted.

8.11    The Cantus notified the F.B.I. and the embassy of the Country of Birth of Mrs. Cantu and had to fight to impede their son's cremation and to be able to transport his body for proper Christian Burial according to their cultural and religious beliefs. The TCME office appointed an attorney to impede the Cantus to obtain all records from the Autopsy of their son. It took one year and seven months for the Cantu's to finally obtained the Certified Autopsy Report; Diagrams; and Forensic Photographs. The organ donation

records were destroyed. The Cantus pressed for answers; they were stonewalled; harassed and threaten. Once again, Dr. Willoughby refused to answer questions [even against Policies of the TCME] and appointed an attorney who answered for her, denying any information.

# IX

# DAMAGES

9.1 As a result of Defendants' acts and omissions as set forth above, Plaintiffs have suffered actual damages in excess of the jurisdictional limits of this Court. Plaintiffs bring this lawsuit against Defendants for recovery of loss of companionship and society and Plaintiffs' mental anguish caused by the death of their only child and son Paul Cantu. Plaintiffs further bring suit on behalf of their deceased son Paul Cantu for the injuries he suffered prior to his death, including substantial physical pain and suffering and mental anguish Paul Cantu suffered prior to his death and costs of burial.

9.2 In their capacity as sole heirs to Paul Cantu's estate, Plaintiffs assert a survival claim on the estate's behalf. The estate has incurred damages including, but not limited to, conscious pain and suffering, and death.

9.3 In their individual capacities, Plaintiffs assert wrongful death claims on behalf of all statutory wrongful death beneficiaries. They suffered damages including, but not limited to, past and future mental anguish, loss of companionship, society, services, and affection of their son. Loss of the promise from their son to provide aid and comfort to his elderly parents the Cantus and disabled mother M. Patricia Cantu when his parents could no longer provide medical and other assistance to and for themselves,

9.4 Loss of income for the last two years from Tax Attorney Roberto Cantu's employment and projected loss of income in the future attributable to the post-traumatic stress syndrome due to

the killing and torture of his only child and son by the shooting officers. Loss of money in Tuition and fees for M. Patricia Cantu a PhD Candidate who had to postpone her PhD dissertation due to post-traumatic stress syndrome. Loss of future income even after obtaining her PhD due to post-traumatic stress disorder. Loss of income from what she would have been able to earn from having graduated sooner had Paul Cantu's death had not happened.

9.5 Loss of future income of Paul Cantu, who was very accomplished despite his disability.  Paul was an honor graduate of Texas Tech University where he graduated with a B.A. in Mass Communication and Spanish. Paul had studied abroad in Spain and Portugal and was bilingual and learning a third language. Paul Cantu was a distinguished international violinist since he was only four years old. He was music ambassador for the United States in Germany, Austria, and the Check Republic. Paul Cantu had relocated to Austin Texas to apply to Law School and become an attorney like his father Tax Attorney and CPA Roberto Cantu.

9.6 Severe health problems including permanent disability, mobility and use of her hands by M. Patricia Cantu mother of Paul Cantu. Psoriasis and psoriatic arthritis are genetic illness aggravated by stress. M. Patricia Cantu has suffered tremendous amount of stress, and post-traumatic stress due to the violent death of her only child and son Paul Cantu.

**9.7**   The intentional infliction of physical pain, suffering, emotional pain and shock and life-threatening injuries [cardiac arrest; stiff jaw and pulverized joints in both knees] to Decedent Paul Andrew Cantu from the "non- lethal" projectile to Paul Cantu left lower back shot without warning from the back Police Officer Kyle Peterson ("Peterson") when Paul Cantu was on his knees at the time of Police Officer's Peterson's firing of the less than lethal projectile.

9.8 The intentional infliction of physical pain, suffering, emotional pain, and shock by use of deadly force inflicted upon Paul Cantu by Mattingly [a veteran who twice served in

Afghanistan] and Camacho who shot Paul Cantu an average of 22 gunshots in a premeditated military-style execution using military weapons not even allowed in third world countries at civil war.

9.9 The intentional infliction of torture by Beiroeski, Camacho and other unidentified APD Officers after Paul Cantu laid mortally wounded but still alive causing severe physical pain, suffering, and emotional pain. Beirowski removed with his shears all of Paul Cantu's clothing leaving him completely naked in less than 33 degrees weather, bleeding to death in the dirt. Beirowski handcuffed Paul Cantu and proceeded to torture him with tasers in direct contact to his bare skin in his head; neck; face; forehead; testicles; buttocks; abdomen; hands; and arms. This unnecessary; extremely violent and senseless premeditated torture would shock any normal person's conscience.

9.10    The severe physical assault and battery which caused broken bones; injuries and bruises all over Paul Cantu's body widely evidence in the Certified Autopsy Reports; Medical Records; Forensic Photographs is an unacceptable use of Police Brutality in a weak, debilitated and severely ill disabled young man.

9.11    The sexual assault perpetrated by Beirowski and other APD officers evidenced by Medical Records and Forensic Photographs is disgusting and unacceptable. Especially considering that ALL the defendants were issued new military weapons right after the attack; went about their business as usual [despite supposedly being placed in "administrative leave" And continue to be free without any repercussions is a threat to the young men in Austin Texas. But specially to minorities Hispanics; people with disabilities and those with chronic and debilitating medical conditions.

## X

## PUNITIVE DAMAGES

**10.1** Defendants have acted with malice or reckless indifference to Paul Cantu and Plaintiffs' rights. Defendants, by engaging in the aforementioned acts and/or in authorizing and/or ratifying the aforementioned acts, engaged in willful, malicious, intentional, oppressive, and deadly conduct, and acted with willful and conscious disregard, or alternatively reckless disregard or indifference of the rights, welfare, and safety of Plaintiffs, therefore justifying the award of punitive and exemplary damages in an amount to be determined at trial. Therefore, Plaintiffs additionally bring suit for punitive damages and exemplary damages.

## XI

## ATTORNEYS' FEES AND EXPERT FEES

**11.1** A prevailing party may recover reasonable attorneys' fees, expert fees, and costs. Plaintiffs bring lawsuit for these fees from Defendants. Plaintiffs seeks all reasonable expert fees and attorneys' fees in this case, including preparation and trial of this lawsuit, post-trial, pre-appeal work, any appeal and post-judgment discovery and collection in the event  execution on the judgment is necessary. Plaintiffs are entitled to litigation expenses      including pursuant to 42 U.S.C. § 1988.

## XII

## JURY DEMAND

**12.1** Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs request a jury for all issues triable to a jury.

**PRAYER FOR RELIEF**

WHEREFORE, PREMISES CONSIDERED, Plaintiffs pray that Defendants be cited to

appear and answer herein, and, upon final trial, Plaintiff shave Judgment against Defendants,

jointly and severally, as requested above, and as follows:

1. Judgment against Defendants for all damages alleged in this petition;

2. Interest before and after judgment at the highest rate provided by law, until paid;

3. Costs of suit;

4. Reasonable and necessary attorneys' fees and expert witness fees;

5. Punitive damages; and

6. Such other and further relief to which Plaintiffs may be justly entitled.

DATED: _January 26, 2021_

Respectfully submitted,

Roberto Cantu, in his individual capacity
robcantulaw@gmail.com

M. Patricia Cantu, in her individual capacity
mpatriciacan2@gmail.com

210-776-5070
1032 W. Woodlawn Ave.
San Antonio, TX 78201

44