# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF TEXAS
# AUSTIN DIVISION

| | | |
|---|---|---|
| **M. PATRICIA CANTU and** <br> **ROBERTO CANTU,** <br> *Plaintiffs* | § <br> § <br> § <br> § | |
| **v.** | § <br> § | **CASE NO. 1:21-CV-00084-DAE-SH** |
| **AUSTIN POLICE DEPARTMENT,** <br> **MICHAEL JOSEPH, JACOB** <br> **BEIROWSKI, ROBERT** <br> **MATTINGLY, LUIS ALBERTO** <br> **CAMACHO, III, KYLE PETERSON,** <br> **JULIAN PARDO-MARTIN, and** <br> **CHRISTOPHER J. KNODEL,** <br> *Defendants* | § <br> § <br> § <br> § <br> § <br> § <br> § <br> § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

**TO:   THE HONORABLE DAVID A. EZRA**
**UNITED STATES DISTRICT JUDGE**

Plaintiffs M. Patricia and Roberto Cantu, on behalf of their deceased son Paul Cantu ("Cantu"),

bring this excessive force and wrongful death lawsuit against the City of Austin and several Austin

Police Department ("APD") officers.

Now before the Court are Defendants Michael Joseph, Jacob Beirowski, Robert Mattingly,

Luis Alberto Camacho III, and Kyle Peterson's Motion for Summary Judgment, filed August 7,

2023 (Dkt. 71); Defendants City of Austin on behalf of the Austin Police Department, Julian

Pardo-Martin, and Christopher J. Knodel's Motion for Summary Judgment, filed August 7, 2023

(Dkt. 72); Plaintiffs' Response to both summary judgment motions, filed August 29, 2023

(Dkt. 73); and Defendants' Reply, filed September 26, 2023 (Dkt. 78).[1]

---

[1] The District Court referred all dispositive motions in this case to this Magistrate Judge for Report and Recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72, and Rule 1(d) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas. Dkt. 23.

### I.   Plaintiffs' Objections to Summary Judgment Evidence

Defendants attach to their motions declarations, written police reports, and affidavits from each of the defendant officers describing their interactions with Cantu. Dkts. 71-1 through 71-7. Plaintiffs' response brief includes a table objecting to these exhibits as "[h]earsay, unreliable, self-serving," but they make no arguments in support of these conclusory objections. Dkt. 73 at 6.

Rule 56(e) and the Federal Rules of Evidence govern the submission of evidence at summary judgment. Under Rule 56(c)(4), affidavits may be used to support or oppose a motion for summary judgment if they are "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Evidence offered at summary judgment "need not yet be in a form admissible at trial, but the party offering the evidence needs to be able to demonstrate that it can be put into an admissible form by the time of a trial." *In re Deepwater Horizon*, 48 F.4th 378, 385 (5th Cir. 2022).

Each declaration describes events based solely on the officer's personal knowledge, as permitted by Rule 56(c)(4). The attached statements and interviews also are admissible at summary judgment because each officer attests in his declaration that his statements in the attachments accurately reflect his knowledge. Dkts. 71-1 through 71-7. The Court finds that the affidavits properly establish that each officer could testify as to his personal knowledge on the matters in the attachments at trial. Therefore, the Court **OVERRULES** Plaintiffs' objections.

### II.   Facts

At about 10:25 p.m. on January 28, 2019, APD Officer Jacob Beirowski attempted to pull over a black Chrysler sedan after the driver failed to stop at an intersection and nearly hit another car. Dkt. 71-4 at 7. Rather than stop, the driver evaded Beirowski by speeding through a grocery store parking lot. *Id.* Beirowski used the license plate to identify Cantu as the car's owner and called

2

Cantu's emergency contact: his father, Plaintiff Roberto Cantu, who was in San Antonio. Beirowski Tr. at 38:2-11, Dkt. 74-10 at 10; Dkt. 71-4 at 8. While on the phone, Roberto Cantu saw a text message from his son stating that his car was "destroyed" and naming a residential street. Dkt. 71-4 ¶ 3. Cantu's mother, Plaintiff M. Patricia Cantu, asked APD to locate her son. Dkt. 1 (Complaint) ¶¶ 6.21.

At 1:40 a.m. the next day, while searching the area, APD Sergeant Michael Joseph found Cantu's car off the road, down a hill and partially in bushes. Dkt. 71-1 ¶ 3. Joseph drove down into the ditch and parked behind Cantu's car with his spot lights on. *Id.* Joseph saw Cantu sit up in the driver's seat, get out of his car, and start to walk around the trunk of his car toward him. *Id.* at ¶ 4. Cantu's right arm was raised, and Joseph saw that he was pointing an object directly at him. "I could see a barrel and knew at this time that it was a handgun. Fearing for my life I drew my gun as quickly as I could as I was also trying to exit my vehicle." *Id.*

Video from Joseph's body-worn camera shows that he immediately ordered Cantu to drop the gun and Cantu knelt on the ground but did not drop the gun, instead pointing it at his own head and later at his chest. Dkt. 71-10 at 7:41:00-15, 45:02-17. For about six minutes, Joseph spoke with Cantu, continuing to tell him to drop his gun and saying, for example: "Hey, what is your name? My name's Michael, man. Talk to me."; "I need you to let go of the gun, and then we can talk, alright, just like two adults, man. If you put yours away, I'll put mine away. Does that sound like a fair deal?"; and "Relax, dude, relax. I think you need help right now, OK? I'm here to help you. . . . Do me a favor. Put the gun down so I can help you." *Id.* at 7:41:11-46:55. Cantu "was sobbing and kept saying he didn't want to hurt anyone." Dkt. 71-1 ¶ 4; *see also* Dkt. 71-10 at 7:41:24-42:06.

Joseph called for assistance on his radio, saying there was a gun, and asked for a ballistic shield. Dkt. 71-1 ¶¶ 4, 6. APD Officer Luis Camacho arrived and "found a position to provide lethal cover." Camacho Tr. at 77:17-21, Dkt. 74-6 at 22; *see also* video from Camacho's body-worn camera, Dkt. 71-8 at 7:45:51-46:16. About a minute later, APD Officer Robert Mattingly arrived with a shield, which he began to set up at a corner of Joseph's car. Mattingly Tr. at 23:20-24, Dkt. 74-8 at 6; video from Mattingly's body-worn camera, Dkt. 71-9 at 7:46:52-47:04.

While Mattingly was setting up the shield, Cantu stood up and pointed the gun toward Joseph and Mattingly. Dkt. 71-1 ¶ 6; Dkt. 71-8 at 7:47:01-09. Camacho and Mattingly then shot at Cantu. Assistant Police Chief Jeff Greenwalt testified that the officers fired sixteen times (ten rounds by Camacho, six by Mattingly), hitting Cantu five times "in a matter of two or three seconds." Greenwalt Tr. at 40:18-42:8, Dkt. 74-3 at 60-61. Cantu fell to the ground on his back. For approximately the next two minutes, Cantu moved his arms as officers ordered him to raise his hands and place them on his stomach, Dkt. 71-10 at 7:47:13-49:10; Dkt. 71-1 ¶¶ 6-7. The video evidence shows that officers then approached Cantu and handcuffed him, and Beirowski and APD Officer Julian Pardo-Martin[2] administered first aid. Dkt. 71-10 at 7:49:10-50. The officers applied dressings to Cantu's wounds, and Pardo-Martin began chest compressions. Dkt. 71-6 ¶ 5; video from Beirowski's body-worn camera, Dkt. 71-11 at 7:50:31-51:22; video from Pardo-Martin's body-worn camera, Dkt. 71-13 at 7:50:51-54:06.

Joseph stated in his declaration that officers found Cantu's gun at the scene "in the grass about 2 feet from his right shoulder." Dkt. 71-1 at ¶ 7; *see also* Beirowski declaration, Dkt. 71-4 ¶ 9 ("I saw a handgun on the ground a couple feet away from Cantu. I looked and saw that it was a black semi-automatic pistol."); Pardo-Martin declaration, Dkt. 71-6 ¶ 4 ("As we approached the suspect

---

[2] Pardo-Martin's name is incorrectly spelled in the Complaint as "Padro-Martin." Dkt. 71-6 at 2.

I observed a black semi-automatic handgun on the ground near the suspect's head within arm's reach of the suspect."). Defendants submit evidence that Cantu bought the pistol recovered at the scene the day before he died, and that it was found loaded with a bullet in the chamber and the safety off. Dkt. 78-4 at 113-16, 128-33.

Pardo-Martin followed EMS as they took Cantu to a hospital and guarded him at the hospital until he was relieved by APD Officer Christopher J. Knodel. Dkt. 71-6 ¶¶ 5, 8; Dkt. 71-7 ¶ 3. Cantu was pronounced dead at 3:27 a.m. *Id.* ¶ 4; Dkt. 74-4 at 3.

Plaintiffs contend that Cantu was "suicidal and suffering from mental distress when Sgt. Joseph encountered him," and that he suffered neurological issues and had experienced seizures and other symptoms. Dkt. 1 ¶ 6.20; Dkt. 73 at 18. Plaintiffs also allege that the officers denied Cantu medical care on the scene and that after Cantu was transported to the hospital, Pardo-Martin and Knodel did not identify him to medical staff, delaying his treatment. Dkt. 1 ¶¶ 6.58-59; Dkt. 73 at 29.

Plaintiffs filed this civil rights lawsuit against APD and Joseph, Beirowski, Mattingly, Camacho, Peterson, Pardo-Martin, and Knodel (collectively, "Defendant Officers"). Plaintiffs assert an Americans with Disabilities Act ("ADA") claim against APD and claims under 42 U.S.C. § 1983 against the Defendant Officers for excessive force, in violation of the Fourth Amendment, and illegal racial profiling and denial of medical treatment, in violation of the Fourteenth Amendment.[3]

The City and the Defendant Officers now move for summary judgment. The City argues that Plaintiffs' ADA claim fails as a matter of law. The Defendant Officers argue that they are entitled to qualified immunity from Plaintiffs' constitutional claims.

---

[3] Plaintiffs also asserted Section 1983 claims against the City of Austin, the Travis County Medical Examiner's Office, and several individual defendants, which the District Court dismissed. Dkt. 48.

### III.    Summary Judgment Standard

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials, and any affidavits on file show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. A court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Once the moving party has shown the absence of a genuine issue of material fact, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 585 n.10, 586-87. The nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence.'" *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citation omitted).

The party opposing summary judgment must identify specific evidence in the record and to articulate the precise manner in which that evidence supports its claim. *Adams v. Travelers Indem. Co. of Conn.*, 465 F.3d 156, 164 (5th Cir. 2006). "Rule 56 does not impose upon the district court a duty to sift through the record in search of evidence to support a party's opposition to summary

judgment." *Id.* (citation omitted). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## IV.    Analysis

Defendants move for summary judgment on all claims. Plaintiffs argue in response that genuine issues of material fact exist as to their (1) Title II ADA claim against the City; (2) excessive force claims against Camacho and Mattingly; and (3) deliberate indifference to medical needs claims against Joseph, Beirowski, Peterson, Pardo-Martin, and Knodel.

Plaintiffs do not respond to Defendants' motions for summary judgment on their excessive force claims against Joseph, Beirowski, and Peterson; their racial profiling claims against Joseph and Beirowski; or their allegations that Pardo-Martin and Knodel gave permission to harvest Cantu's organs despite possessing his driver's license showing he was not an organ donor. By failing to respond, they have abandoned those claims. *In re Dall. Roadster, Ltd.*, 846 F.3d 112, 125-26 (5th Cir. 2017).

### A.  ADA Claim

First, Plaintiffs assert their ADA claim against APD. Dkt. 1 ¶¶ 8.3-4. A police department may not be sued separately from a city unless it "enjoys a separate and distinct legal existence." *Est. of Schroeder v. Gillespie Cnty.*, 23 F. Supp. 3d 775, 781 (W.D. Tex. 2014). Unless the city "has taken explicit steps to grant the servient agency with jural authority, the agency cannot engage in any litigation except in concert with the government itself." *Darby v. Pasadena Police Dep't*, 939 F.2d 311, 313 (5th Cir. 1991). APD is not a legal entity that can be sued and must be dismissed as a Defendant. *Justice v. Austin Police Dep't*, No. A-20-CV-1063-RP, 2021 WL 1930302, at *2 (W.D. Tex. May 13, 2021), *R. & R. adopted*, 2021 WL 11669843 (June 8, 2021). Because

Plaintiffs filed their Complaint *pro se* and because the City received notice and has "conducted its case exactly as it would have had [Plaintiffs] sued the proper entity" such that there is no prejudice to the City, the Court recommends that the City be substituted for APD. *Darby*, 939 F.2d at 315; *Wilson v. Austin Police Dep't*, No. A-23-CV-233-RP-ML, 2023 WL 3688462, at *2 (W.D. Tex. Apr. 24, 2023) (construing a *pro se* claim against APD as a claim against the City of Austin), *R. & R. adopted*, 2023 WL 3688014 (W.D. Tex. May 26, 2023).

As stated, Plaintiffs allege that Cantu was "suicidal and suffering from mental distress" when police encountered him. Dkt. 73 at 18. They contend that the City, through the actions of APD officers, violated Title II of the ADA by discriminating against Cantu based on his disability. They also argue that the City failed to train its officers "to accommodate a person suffering from acute mental distress resulting in suicidal ideations." *Id.* at 17.

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government." 42 U.S.C. § 12131(1)(B).

But Title II "does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life." *Hainze v. Richards*, 207 F.3d 795, 801 (5th Cir. 2000). In *Hainze*, the Fifth Circuit affirmed dismissal of the plaintiff's claim under Title II where officers shot a suicidal suspect after he walked toward them screaming profanities and holding a knife. *Id.* at 801-02. The Court reasoned:

> Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.

*Id.* at 801; *see also Allen v. Hays*, 65 F.4th 736, 752 (5th Cir. 2023) (holding that "the law in this circuit is unequivocal" that the ADA does not apply before authorities "secur[e] the scene and ensur[e] that there is no threat to human life").

Joseph testified that Cantu pointed a gun at him after Cantu got out of his car. Joseph Tr. at 23:8-24:3, Dkt. 74-7 at 6. Cantu subsequently dropped to his knees and pointed the gun at his own head. *Id.* at 24:8-27:1, Dkt. 74-7 at 6-7. Joseph's body-worn camera footage shows that he spoke with Cantu for about six minutes, repeatedly ordering him to drop his gun. Dkt. 71-10 at 7:41:11-46:55. Camacho and Mattingly arrived while Joseph was talking with Cantu. Dkt. 71-8 at 7:45:51-46:16; Dkt. 71-9 at 7:46:52-47:04. Footage from their body cameras shows that, while Mattingly set up the ballistic shield, Cantu stood up and pointed his gun towards Joseph and Mattingly. Dkt. 71-8 at 7:47:01-09; Dkt. 71-9 at 7:47:01-09. Camacho and Mattingly shot Cantu, both testifying that they saw him point a gun at officers. Camacho Tr. at 34:25-35:13, Dkt. 74-6 at 11; Mattingly Tr. at 18:2-6, Dkt. 74-8 at 5.

The undisputed summary judgment evidence shows that the scene was not secure when Plaintiffs allege the City should have accommodated Cantu's disability. Plaintiffs argue that there are factual issues as to whether the scene was secure when Cantu was shot, but they present no

evidence to rebut the video footage. Dkt. 73 at 16.[4] Plaintiffs' ADA claim fails as a matter of law. *See Munroe v. City of Austin*, 300 F. Supp. 3d 915, 932 (W.D. Tex. 2018) (granting summary judgment on an ADA claim where plaintiffs offered no evidence "to suggest that there is a genuine dispute of material fact regarding whether the Officers had completed securing the scene at the time of the shooting").

## B. Excessive Force Claim

Camacho and Mattingly move for summary judgment on Plaintiffs' excessive force claim under Section 1983.

### 1. Legal Standards

42 U.S.C. § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . . .

To establish a claim under Section 1983, a plaintiff must (1) show a violation of a right secured by the Constitution or laws of the United States, and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law. *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013).

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a

---

[4] Plaintiffs cite *Morais v. City of Philadelphia*, No. 06-582, 2007 WL 853811 (E.D. Penn. Mar. 19, 2007), in which the United States District Court for the Eastern District of Pennsylvania permitted an ADA claim to proceed when fact issues existed as to whether the decedent "pose[d] a threat to innocent parties" and "there was no immediate threat to human life." *Morais*, 2007 WL 853811, at *13. *Morais* is distinguishable because there was no threat before the officers breached the apartment after waiting outside for two hours. *Id.* at *13.

reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). A qualified immunity defense alters the usual summary judgment burden of proof. *Renfroe v. Parker*, 974 F.3d 594, 599 (5th Cir. 2020). After qualified immunity has been invoked as a defense, "the plaintiff must rebut it by establishing (1) that the officer violated a federal statutory or constitutional right and (2) that the unlawfulness of the conduct was 'clearly established at the time.'" *Id.* (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)).

A right is clearly established if it "is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Cunningham v. Castloo*, 983 F.3d 185, 191 (5th Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). When Section 1983 claims are brought against multiple officers, each officer's entitlement to qualified immunity must be examined individually. *Meadours v. Ermel*, 483 F.3d 417, 422 (5th Cir. 2007). "All inferences are drawn in the plaintiff's favor," but a "plaintiff's version of the facts should not be accepted for purposes of qualified immunity when it is blatantly contradicted and utterly discredited by video recordings." *Renfroe*, 974 F.3d at 599 (cleaned up).

To prevail on an excessive force claim, a plaintiff must establish: "(1) injury (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Harris v. Serpas*, 745 F.3d 767, 772 (5th Cir. 2014) (citation omitted). Courts evaluate reasonableness from "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," and they must consider whether the suspect posed an immediate threat to the safety of the officers or others when force was used. *Graham v. Connor*, 490 U.S. 386, 396 (1989). This is an objective standard, and courts do not consider the officers' underlying intent or motivations. *Id.* at 397.

Deadly force is not unreasonable when an "officer would have reason to believe that the suspect poses a threat of serious harm to the officer or others." *Harris*, 745 F.3d at 772 (citation omitted). Courts in the Fifth Circuit do not consider whether the officer actually was in danger or the officer's actions leading up to the use of force in determining whether the force was reasonable, asking only whether the officer reasonably believed the suspect was a threat. *Id.* at 772-73.

### 2.   Camacho and Mattingly's Use of Deadly Force Was Reasonable

Plaintiffs argue that Camacho and Mattingly shot at Cantu sixteen times, violating his Fourth Amendment rights by using excessive force. Dkt. 73 at 10. The officers argue that their use of deadly force was not unreasonable and that they are entitled to qualified immunity because they "reasonably believed that each of them was justified when he returned fire after Paul Cantu raised up abruptly into a firing position and pointed his gun at Sergeant Joseph and Officer Mattingly." Dkt. 71 at 18. Plaintiffs contend that it was unreasonable for Camacho and Mattingly to use deadly force because Cantu "did not pose a threat at the time he was shot." Dkt. 73 at 27. Plaintiffs also argue that it was unreasonable for Camacho and Mattingly to shoot at Cantu after their first shots incapacitated him. *Id.* at 25, 27-28.

Camacho testified that he shot Cantu "because he presented a lethal threat to Sergeant Joseph and Officer Mattingly" by pointing a gun at them. Camacho Tr. at 31:13-17, 34:22-35:2, Dkt. 74-6 at 10-11. Camacho also testified that he was told before he arrived at the scene that "Sergeant Joseph was out on someone who had a gun." *Id.* at 119:7-8, Dkt. 74-6 at 32. Video footage from Camacho's body-worn camera and the camera on Joseph's vehicle shows that Cantu pointed a handgun at Joseph and Mattingly right before Camacho shot him. Dkt. 71-8 at 7:47:01-09; video from Joseph's car-mounted camera, Dkt. 71-14 at 1:47:01-09. Plaintiffs contend that the video footage does not "provide evidence that [Cantu] rose up with a gun in his hand" or pointed the gun

at Joseph and Mattingly. Dkt. 73 at 12. This argument is "utterly discredited" by the footage and the officers' discovery of a gun next to Cantu. *Renfroe*, 974 F.3d at 599 (citation omitted). It is clear from the footage that Cantu was shot after he quickly arose from a kneeling position and pointed a gun at the officers. Dkt. 71-14 at 1:47:01-12.

Based on these facts, it was reasonable for Camacho to fear for Joseph and Mattingly's safety at the moment of the fatal shooting because he saw Cantu point his gun at them. *See Harris*, 745 F.3d at 773 (finding that officers reasonably feared for their safety when the suspect was "standing up out of bed and had raised the knife above his head" at the moment of the shooting); *Ramirez v. Knoulton*, 542 F.3d 124, 131 (5th Cir. 2008) (holding that deadly force was not objectively unreasonable when the armed suspect refused commands and "brought his hands together in what we believe could reasonably be interpreted as a threatening gesture, as if to grip the handgun with both hands in preparation to aim it at the officers").

Mattingly arrived on the scene less than one minute before he shot Cantu. Dkt. 71-9 at 7:46:52-47:12. Mattingly testified that he fired after Cantu "stood up [and] pointed the gun in my direction." Mattingly Tr. at 17:25-18:6, Dkt. 74-8 at 5. The Court finds that, for the same reasons it was reasonable for Camacho to fear for Mattingly's life, it was reasonable for Mattingly to fear for his own life.

Plaintiffs next argue that even if it were reasonable for Camacho and Mattingly to use deadly force, once he had been shot Cantu was not "a continuing threat to warrant Camacho shooting at him eight additional times after he collapsed" or Mattingly continuing to fire. Dkt. 73 at 27-28. Use of force "that is reasonable at one moment can become unreasonable in the next if the justification for the use of force has ceased." *Mason v. Lafayette City-Par. Consol. Gov't*, 806 F.3d 268, 277 (5th Cir. 2015) (citation omitted). The reasonableness inquiry focuses on whether there

13

is still a justification for force, not merely how many shots were fired. *Garza v. Briones*, 943 F.3d 740, 748 (5th Cir. 2019). "[I]f police officers are justified in firing at a suspect in order to end a severe threat to public safety, the officers need not stop shooting until the threat has ended." *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 777 (2014)).

Camacho and Mattingly fired at Cantu immediately after he pointed a gun at Joseph and Mattingly, and the two fired every shot within a few seconds. Dkt. 71-8 at 7:47:08-12. Plaintiffs offer no evidence to indicate that it was clear to Camacho and Mattingly that Cantu was no longer a threat after the first shots. There was no break between the shots fired while Cantu was standing and those fired after he fell to the ground, which could raise an issue of material fact that Cantu was "clearly incapacitated." *Cf. Mason*, 806 F.3d at 277-78 (concluding that a reasonable jury could find an officer used excessive force after he shot a suspect five times, paused while he "lay incapacitated on the ground," then fired two more shots); *Hodge v. Engleman*, 636 F. Supp. 3d 727, 735-36 (N.D. Tex. 2022) (holding that nineteen shots fired by two officers against an armed suspect within three-and-a-half seconds was not objectively unreasonable).

Plaintiffs have not shown a genuine issue of fact that the "threat to public safety" ended after Cantu was shot the first time. *Plumhoff*, 572 U.S. at 777. Therefore, they have not shown a genuine issue of fact that Camacho and Mattingly violated Cantu's constitutional rights, and the Court recommends that the District Court grant their motion for summary judgment.

## C.  Deliberate Indifference Claims

Finally, Plaintiffs allege that Joseph, Beirowski, Peterson, Pardo-Martin, and Knodel were deliberately indifferent to Cantu's medical needs by wrongfully delaying his medical treatment. Delay of medical care for a single act or omission can violate the Constitution if the officer "acted with subjective deliberate indifference to [the] need for medical care." *Westfall v. Luna*, 903 F.3d

534, 551 (5th Cir. 2018) (applying the Eighth Amendment standard to a pretrial detainee). A plaintiff can show deliberate indifference by showing that the officer "refused to treat her, ignored her complaints, intentionally treated her incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id.* (cleaned up). Delay of medical care is only a constitutional violation if the deliberate indifference results in substantial harm. *Id.*

Plaintiffs argue that Pardo-Martin and Knodel critically delayed Cantu's medical care by failing to identify him at the hospital. Dkt. 73 at 28-29.[5] Pardo-Martin and Knodel assert that they are entitled to qualified immunity, contending that Plaintiffs present no evidence they were deliberately indifferent to Cantu because they did not withhold any information from medical personnel. Dkt. 72 at 15. Pardo-Martin and Knodel contend that they "responded appropriately by immediately securing the scene and providing lifesaving measures, and then accompanied EMS to the hospital." *Id.* at 14. Plaintiffs offer no evidence that Cantu's treatment was delayed or that any delay caused harm.

Plaintiffs also do not describe any substantial harm in medical treatment caused by Joseph, Beirowski, or Peterson. Dkt. 73 at 28-29. They assert no facts and submit no evidence that the officers violated Cantu's constitutional rights by disregarding his medical needs. Their allegations that the officers caused substantial harm are "insufficient" to defeat a motion for summary judgment on qualified immunity. *Renfroe*, 974 F.3d at 599. Because Plaintiffs have not shown the existence of a genuine issue of material fact that any officer's conduct caused substantial harm,

---

[5] In Exhibit L to Plaintiff's response, Plaintiffs submit photographs of Cantu's driver's license and other identifying documents in APD's possession, arguing that "[a]ll officers on the scene knew Paul Cantu's identity." Dkt. 73 at 29; Dkt. 74-12. The photographs do not show that Pardo-Martin or Knodel knew Cantu's identity or delayed his treatment.

they cannot show that any officer was deliberately indifferent. The Court finds that Joseph, Beirowski, Peterson, Pardo-Martin, and Knodel are entitled to qualified immunity.

Plaintiffs have not carried their burden of producing evidence sufficient for a reasonable jury to find that Joseph, Beirowski, Peterson, Pardo-Martin, or Knodel violated Cantu's constitutional rights by delaying his medical treatment. The Court recommends that the District Court grant those Defendants' motions for summary judgment.

## V.     Recommendation

For these reasons, this Magistrate Judge **RECOMMENDS** that the District Court **GRANT** the Defendant Officers' Motion for Summary Judgment (Dkt. 71) and **GRANT** the City of Austin and Defendants Pardo-Martin and Knodel's Motion for Summary Judgment (Dkt. 72). This Magistrate Judge **FURTHER RECOMMENDS** that the District Court **ENTER FINAL JUDGMENT for** Defendants.

It is **ORDERED** that this case be **REMOVED** from this Magistrate Judge's docket and **RETURNED** to the docket of the Honorable David A. Ezra.

## VI.     Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. U.S. Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987). A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from de novo review by the District Court of the proposed findings and recommendations in the Report and, except on grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings

and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140, 150-53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).

**SIGNED** on December 12, 2023.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE