IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| M. PATRICIA CANTU AND ROBERTO CANTU, | § § § | No. 1:21-CV-84-DAE |
| Plaintiffs, | § § | |
| vs. | § § | |
| AUSTIN POLICE DEPARTMENT, MICHAEL JOSEPH, JACOB BEIROWSKI, ROBERT MATTINGLY, LUIS ALBERTO CAMACHO, III, KYLE PETERSON, JULIAN PARDO-MARTIN, CHRISTOPHER J. KNODEL, | § § § § § § § § | |
| Defendants. | § § | |

ORDER: (1) ADOPTING REPORT AND RECOMMENDATION OF THE
MAGISTRATE JUDGE; AND (2) GRANTING MOTIONS FOR SUMMARY
<u>JUDGMENT</u>

Before the Court is a Report and Recommendation (the "Report") (Dkt. # 79) submitted by United States Magistrate Judge Susan Hightower. The Court finds this matter suitable for disposition without a hearing. After reviewing the Report, the Court **ADOPTS** Judge Hightower's recommendation, and:

(1) **GRANTS** Defendant Officers, Michael Joseph, Jacob Beirowski, Robert Mattingly, Luis Camacho, and Kyle Peterson's Motion for Summary Judgment (Dkt. # 71), and (2) **GRANTS** Defendants City of Austin (the "City") on behalf of

the Austin Police Department ("APD") and Officers Julian Padro-Martin and Christopher Knodel's Motion for Summary Judgment (Dkt. # 72).

BACKGROUND

The Court will recite the background facts of this very unfortunate matter as stated by Judge Hightower in her Report.[1]  At about 10:25 p.m. on January 28, 2019, APD Officer Jacob Beirowski attempted to pull over a black Chrysler sedan after the driver failed to stop at an intersection and nearly hit another car.  (Dkt. # 71-4 at 7.)  Rather than stop, the driver evaded Beirowski by speeding through a grocery store parking lot.  (Id.)  Beirowski used the license plate to identify Paul Cantu ("Cantu") as the car's owner and called Cantu's emergency contact: his father, Plaintiff Roberto Cantu, who was in San Antonio at the time.  (Beirowski Tr. at 38:2-11, Dkt. # 74-10 at 10; Dkt. # 71-4 at 8.)  While on the phone, Roberto Cantu saw a text message from his son stating that his car was "destroyed" and naming a residential street.  (Dkt. # 71-4 ¶ 3.)  Cantu's mother, Plaintiff M. Patricia Cantu, asked APD to locate her son.  (Dkt. # 1 (Complaint) ¶¶ 6.21.)

---

[1] To the extent any objections are made to Judge Hightower's recitation of the facts, the Court will note it in Plaintiffs' objections discussed below.

At 1:40 a.m., early the next morning, while searching the area, APD Sergeant Michael Joseph found Cantu's car off the road, down a hill and partially in bushes. (Dkt. # 71-1 ¶ 3.) Joseph drove down into the ditch and parked behind Cantu's car with his spot lights on. (Id.) Joseph saw Cantu sit up in the driver's seat, get out of his car, and start to walk around the trunk of his car toward him. (Id. at ¶ 4.) Cantu's right arm was raised, and Joseph saw that he was pointing an object directly at him. According to Joseph, "I could see a barrel and knew at this time that it was a handgun. Fearing for my life I drew my gun as quickly as I could as I was also trying to exit my vehicle." (Id.) Video evidence from Joseph's body-worn camera shows that he immediately ordered Cantu to drop the gun and Cantu knelt on the ground but did not drop the gun, instead pointing it at his own head and later at his chest. (Dkt. # 71-10 at 7:41:00-15, 45:02-17.) For about six minutes, Joseph spoke with Cantu, continuing to tell him to drop his gun and saying, for example: "Hey, what is your name? My name's Michael, man. Talk to me."; "I need you to let go of the gun, and then we can talk, alright, just like two adults, man. If you put yours away, I'll put mine away. Does that sound like a fair deal?"; and "Relax, dude, relax. I think you need help right now, OK? I'm here to help you. . . . Do me a favor. Put the gun down so I can help you." (Id. at 7:41:11-46:55.) Cantu "was sobbing and kept saying he didn't want to hurt anyone." (Dkt. # 71-1 ¶ 4; see also Dkt. # 71-10 at 7:41:24-42:06.)

3

Joseph called for assistance on his radio, saying there was a gun, and asked for a ballistic shield. (Dkt. # 71-1 ¶¶ 4, 6.) APD Officer Luis Camacho arrived and "found a position to provide lethal cover." (Camacho Tr. at 77:17-21, Dkt. # 74-6 at 22; see also video from Camacho's body-worn camera, Dkt. # 71-8 at 7:45:51-46:16.) About a minute later, APD Officer Robert Mattingly arrived with a shield, which he began to set up at a corner of Joseph's car. (Mattingly Tr. at 23:20-24, Dkt. # 74-8 at 6; video from Mattingly's body-worn camera, Dkt. # 71-9 at 7:46:52-47:04.) While Mattingly was setting up the shield, Cantu stood up and pointed the gun toward Joseph and Mattingly. (Dkt. # 71-1 ¶ 6; Dkt. # 71-8 at 7:47:01-09.) Camacho and Mattingly then shot at Cantu.

Assistant Police Chief Jeff Greenwalt testified that the officers fired sixteen times (ten rounds by Camacho, six by Mattingly), hitting Cantu five times "in a matter of two or three seconds." (Greenwalt Tr. at 40:18-42:8, Dkt. # 74-3 at 60-61.) Cantu fell to the ground on his back. For approximately the next two minutes, Cantu moved his arms as officers ordered him to raise his hands and place them on his stomach. (Dkt. # 71-10 at 7:47:13-49:10; Dkt. # 71-1 ¶¶ 6-7.) The video evidence shows that officers then approached Cantu and handcuffed him, and Beirowski and APD Officer Julian Pardo-Martin administered first aid. (Dkt. # 71-10 at 7:49:10-50.) The officers applied dressings to Cantu's wounds, and Pardo-Martin began chest compressions. (Dkt. # 71-6 ¶ 5; video from Beirowski's

body-worn camera, Dkt. # 71-11 at 7:50:31-51:22; video from Pardo-Martin's body-worn camera, Dkt. # 71-13 at 7:50:51-54:06.)

Joseph stated in his declaration that officers found Cantu's gun at the scene "in the grass about 2 feet from his right shoulder." (Dkt. # 71-1 at ¶ 7; see also Beirowski declaration, Dkt. # 71-4 ¶ 9 ("I saw a handgun on the ground a couple feet away from Cantu. I looked and saw that it was a black semi-automatic pistol."); Pardo-Martin declaration, Dkt. # 71-6 ¶ 4 ("As we approached the suspect I observed a black semi-automatic handgun on the ground near the suspect's head within arm's reach of the suspect."). Defendants have submitted evidence that Cantu bought the pistol recovered at the scene the day before he died, and that it was found loaded with a bullet in the chamber and the safety off. (Dkt. # 78-4 at 113–16, 128–33.) Pardo-Martin followed EMS as they took Cantu to a hospital and guarded him at the hospital until he was relieved by APD Officer Christopher J. Knodel. (Dkt. # 71-6 ¶¶ 5, 8; Dkt. # 71-7 ¶ 3.) Cantu was pronounced dead at 3:27 a.m. (Id. ¶ 4; Dkt. # 74-4 at 3.)

Plaintiffs contend that Cantu was "suicidal and suffering from mental distress when Sgt. Joseph encountered him," and that he suffered neurological issues and had experienced seizures and other symptoms. (Dkt. # 1 ¶ 6.20; Dkt. # 73 at 18.) Plaintiffs also allege that the officers denied Cantu medical care on the scene and that after Cantu was transported to the hospital, Pardo-Martin and

5

Knodel did not identify him to medical staff, delaying his treatment. (Dkt. # 1 ¶¶ 6.58-59; Dkt. # 73 at 29.) On January 27, 2021, Plaintiffs filed this civil rights lawsuit against APD and Joseph, Beirowski, Mattingly, Camacho, Peterson, Pardo-Martin, and Knodel (collectively, "Defendant Officers"). (Dkt. # 1.) Plaintiffs assert an Americans with Disabilities Act ("ADA") claim against APD, and claims under 42 U.S.C. § 1983 against the Defendant Officers for excessive force in violation of the Fourth Amendment, and illegal racial profiling and denial of medical treatment, in violation of the Fourteenth Amendment.[2]

On August 7, 2023, Defendant Officers Joseph, Beirowski, Mattingly, Camacho, and Peterson moved for summary judgment on Plaintiffs' claims against them. (Dkt. # 71.) The same day, the City and Officers Pardo-Martin and Knodel filed their own motion for summary judgment. (Dkt. # 72.) Both motions were fully briefed and referred to Magistrate Judge Hightower for her Report. (Dkt. # 23.) On December 12, 2023, Judge Hightower issued her Report. (Dkt. # 79.) On December 26, 2023, Plaintiffs filed objections to the Report (Dkts. ## 80, 81); on January 9, 2024, Defendants filed a consolidated response to the objections (Dkt. # 82); and on January 11, 2024, Plaintiffs filed their reply (Dkt. # 85). The objections are addressed below.

---

[2] Plaintiffs also asserted Section 1983 claims against the City, the Travis County Medical Examiner's Office, and several individual defendants, which the Court has already dismissed. (Dkt. # 48.)

6

APPLICABLE LAW

The Court must conduct a de novo review of any of the Magistrate Judge's conclusions to which a party has specifically objected. See 28 U.S.C. § 636(b)(1)(C) ("A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."). The objections must specifically identify those findings or recommendations that the party wishes to have the district court consider. Thomas v. Arn, 474 U.S. 140, 151 (1985). A district court need not consider "[f]rivolous, conclusive, or general objections." Battle v. U.S. Parole Comm'n, 834 F.2d 419, 421 (5th Cir. 1987). "A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

Findings to which no specific objections are made do not require de novo review; the Court need only determine whether the Recommendation is clearly erroneous or contrary to law. United States v. Wilson, 864 F.2d 1219, 1221 (5th Cir. 1989).

DISCUSSION

In her Report, Judge Hightower made the following findings: (1) Plaintiffs abandoned their claims for excessive force against Joseph, Beirowski, and Peterson, as well as their claims for racial profiling against Joseph and

Beirowski, and their claims that Pardo-Martin and Knodel gave permission to harvest Cantu's organs despite showing he was not an organ donor on his license; (2) Plaintiffs' ADA claims fail as a matter of law; (3) Camacho and Mattingly's use of deadly force was reasonable and Plaintiffs did not show a genuine issue of material fact that Cantu's constitutional rights were violated; and (4) Plaintiffs failed to show any genuine issue of material fact that the individual officers' conduct caused substantial harm or that any officer was deliberately indifferent to Cantu's medical treatment. (Dkt. # 79.)

Plaintiffs have filed objections to the Report. (Dkts. ## 80, 81.) Plaintiffs argue that: (1) the Magistrate Judge was incorrect in concluding that there was no material fact issue as to whether the scene was secured and thus there was no ADA violation; (2) there is a fact issue as to whether Cantu pointed a gun at the officers; (3) the Magistrate Judge failed to distinguish similar cases; (4) the Report errs by determining that Cantu was a continuing threat such that the officers continued to fire their weapons after Cantu fell limp to the ground; and (5) the Report errs by concluding there is no material dispute of fact as to Plaintiffs' deliberate indifference claim. The Court addresses each objection in turn.

A.   <u>ADA Violation</u>

Plaintiffs argue that the Report errs by finding there was no genuine issue of material fact as to Plaintiffs' ADA claim. Plaintiffs argue there is no

evidence to support the Magistrate Judge's conclusion that the scene was unsecure given that Cantu was in a secluded area away from any of the officers or other individuals.  (Dkt. # 80 at 6.)  Plaintiffs thus maintain that there are material fact issues as to their ADA claim against the City.  (Id.)

Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  A "public entity" includes "any department, agency, special purpose district, or other instrumentality of a State or States or local government."  Id. § 12131(1)(B).

In Hainze v. Richards, 207 F.3d 795 (5th Cir. 2000), the Fifth Circuit stated:

> [W]e hold that Title II does not apply to an officer's on-the-street responses to reported disturbances or other similar incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life. Law enforcement personnel conducting in-the-field investigations already face the onerous task of frequently having to instantaneously identify, assess, and react to potentially life-threatening situations. To require the officers to factor in whether their actions are going to comply with the ADA, in the presence of exigent circumstances and prior to securing the safety of themselves, other officers, and any nearby civilians, would pose an unnecessary risk to innocents. While the purpose of the ADA is to prevent the discrimination of disabled individuals, we do not think Congress intended that the fulfillment of that objective be attained at the expense of the safety of the general public.

207 F.3d at 801; see also Allen v. Hays, 65 F.4th 736, 752 (5th Cir. 2023) ("[T]he law in this circuit is unequivocal: The ADA 'does not apply to an officer's on-the-street responses to . . . incidents, whether or not those calls involve subjects with mental disabilities, prior to the officer's securing the scene and ensuring that there is no threat to human life.'" (quoting Hainze, 207 F.3d at 801)).

While Plaintiffs argue "video evidence shows there are material disputed facts related to whether Paul Cantu pointed a weapon at officers or anyone," the Court disagrees. Video evidence from officers' body cams clearly depicts Cantu getting out of his car and pointing a gun at Officer Joseph upon arriving at the scene. (Dkt. # 71-14.) Additionally, the videos show Cantu later standing up and pointing his gun towards Officers Joseph and Mattingly. (Dkt. # 71-8.) Additionally, prior to that point, the video evidence demonstrates that Officer Joseph spoke for several minutes to Cantu, pleading with him to accept his help and to drop his gun and walk over to him. (Dkt. # 71-10.) Furthermore, the officers' own accounts of the events in question lend credence to the video evidence, all testifying that Cantu pointed his gun at first his own head, and then at the officers. Other than arguing a fact issue exists, Plaintiffs have pointed to no evidence which would suggest the scene was in fact secure prior to the Officers' response to Cantu pointing a weapon at them. Accordingly, upon de novo review, the Court will overrule this objection because the Court finds no error in the

Magistrate Judge's conclusion that Plaintiffs' ADA claim must fail. The Court will likewise overrule Plaintiffs' objection that there is a fact issue as to whether Cantu pointed a weapon at the Officers prior to their firing their weapons at Cantu, as Plaintiffs have failed to provide sufficient summary judgment evidence to create a factual dispute.

  B. Continuing Threat

  Plaintiffs also argue the Magistrate Judge erred when she determined there was no dispute of material fact that Cantu was a continuing threat such that the officers continued to fire their weapons after Cantu fell limp to the ground. (Dkt. # 80 at 9.) Plaintiffs also contend that the Magistrate Judge failed to properly distinguish the Fifth Circuit's ruling in Roque v. Harvel, 993 F.3d 325 (5th Cir. 2021). (Id.)

  In Roque v. Harvel, the Fifth Circuit confirmed that, after incapacitating a suspect who posed a threat, an officer cannot continue using deadly force. 993 F.3d 325, 336 (5th Cir. 2021). In that case, police shot and killed Jason Roque, a man who was experiencing a mental health crisis while holding a pistol, which was later determined to be a BB gun. Id. Roque and his mother both called 911, and multiple officers responded. Id. at 330. Roque pointed the gun at his head and turned away from the officers, and one officer yelled for him to put the gun down. Id. Roque then turned to face the officers with

11

the gun pointed in the air, and Officer Harvel shot Roque with a semi-automatic rifle.  Id.  Roque immediately doubled over and dropped the gun, and two seconds after the first shot, Harvel fired a second shot that missed Roque, and then a third shot that killed Roque.  Id.  Harvel maintained that he took each shot because he thought Roque was a threat to his mother's life and safety, and Roque's parents sued Harvel under § 1983.  Harvel raised the defense of qualified immunity, and the district court granted his motion as to the first shot but denied the motion as to the second and third shots.  Id. at 331.

In affirming the district court's conclusion, the Fifth Circuit explained that excessive force claims are fact-intensive, and courts must examine the totality of the circumstances to determine whether an officer in the same circumstances would have concluded that a threat existed justifying the particular use of force.  Id. at 333.  Because it was clearly established "and possibly even obvious" on the date of the incident that an officer cannot continue using deadly force after incapacitating a suspect who posed a threat, and resolving all factual disputes in the plaintiffs' favor, the Court held that Officer Harvel was not entitled to qualified immunity.  Id. at 339.

Here, the video evidence indicates that Camacho and Mattingly each fired their weapons in rapid succession and within less than a few seconds of each shot.  (Dkt. # 71-8.)  Neither officer hesitated and then reengaged in firing their

12

weapons. See Ondrej v. Perry, No. SA-21-CV-00281-JKP, 2023 WL 6453478 (W.D. Tex. Oct. 2, 2023). Additionally, the video evidence demonstrates that the officers were a decent distance from Cantu given that he was armed with a gun, and Plaintiffs have failed to present sufficient evidence that any of the officers had a way of knowing that Cantu was incapacitated or the degree to which he was incapacitated, and whether he still in possession of the gun, between the rapid succession of their firing shots at Cantu after he pointed the weapon at the officers. Thus, on these facts, the Court finds that Roque is distinguishable.

Accordingly, upon de novo review, the Court will overrule Plaintiffs' objection because the evidence supports the Magistrate Judge's finding that Plaintiffs failed to present evidence which raises a material as to whether Cantu was "clearly incapacitated."

C. Deliberate Indifference

Plaintiffs next challenge the Magistrate Judge's conclusion that there was no genuine issue of material fact as to whether the officers' conduct was deliberately indifferent to Cantu's medical needs. (Dkt. # 80 at 12.) Plaintiffs maintain that the officers provided false information to the hospital and withheld information as to Cantu's identity which caused an unreasonable delay in his medical care. (Id.)

The Fifth Circuit has described "deliberate indifference as 'an extremely high standard to meet.'" Ford v. Anderson, 90 F.4th 736, 752 (5th Cir. 2024) (quoting Domino v. Tex. Dep't of Crim. Just., 239 F.3d 752, 756 (5th Cir. 2001)).  Here, Plaintiffs have not presented any evidence that Cantu's treatment itself was delayed by any officer's conduct or that any delay caused actual harm.  Accordingly, the Court concludes that the Magistrate Judge did not err in finding that Plaintiffs failed to show the existence of a genuine issue of material fact that any officer's conduct caused substantial harm, nor show that any officer was deliberately indifferent to Cantu's medical needs.  The Court will thus overrule Plaintiffs' objection.

## CONCLUSION

Having reviewed the Magistrate Judge's findings and conclusions and finding no errors, the Court will accept and adopt the Report and Recommendation for the reasons stated therein.  Thus, the Court **ADOPTS** the Magistrate Judge's Report and Recommendation as the opinion of the Court (Dkt. # 79), and **GRANTS** both: (1) Defendant Officers, Michael Joseph, Jacob Beirowski, Robert Mattingly, Luis Camacho, and Kyle Peterson's Motion to for Summary Judgment (Dkt. # 71), and (2) Defendants City of Austin on behalf of the Austin Police Department and Officers Julian Padro-Martin and Christopher Knodel's Motion for Summary Judgment (Dkt. # 72).  Plaintiffs' claims are hereby **DISMISSED**

**WITH PREJUDICE**. The Clerk's Office is **INSTRUCTED TO ENTER JUDGMENT** and **CLOSE THE CASE**.

**IT IS SO ORDERED.**

**DATE:** Austin, Texas, February 8, 2024.

_____
David Alan Ezra
Senior United States District Judge